63 F.3d 148
 UNITED STATES of America, Plaintiff-Appellee,
v.
ALL FUNDS ON DEPOSIT IN ANY ACCOUNTS MAINTAINED IN THE NAMES
OF Heriberto Castro MEZA OR Esperanza Rodriquez DE CASTRO
and all Funds Traceable Thereto at the National Bank of
Greece, in London, England, Including but not Limited to
Account No. 073679, at Midland Bank in London, England,
Including but not Limited to Account Nos. 69350040 and
69358897, at Lloyd's Bank in London England, Including but
not Limited to Account Reference No. TSY2D048423, at Bank of
Credit and Commerce International (BCCI), in London,
Including but not Limited to Accounts Nos. 03062866 and
01160156 and Dresdner Bank in London, England Including but
not Limited to Account No. 257692, Defendants,
Esperanza Rodriquez De Castro, Claimant-Appellant.
 No. 966, Docket 94-6179.
 United States Court of Appeals,
Second Circuit.
 Argued March 17, 1995.
Decided Aug. 10, 1995.
 
 Richard W. Levitt, New York City (Robert I. Targ, South Miami, FL, on the brief), for claimant-appellant.
 Jennifer C. Boal, Asst. U.S. Atty., E.D.N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Deborah B. Zwany, Gary B. Brown, Arthur P. Hui, Asst. U.S. Attys., on the brief), for plaintiff-appellee.
 Before OAKES, CARDAMONE and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Claimant-appellant Esperanza Rodriguez De Castro ("claimant") appeals from a judgment of the United States District Court for the Eastern District of New York (Weinstein, J.), granting the government's motion for summary judgment in a civil forfeiture action against funds on deposit in claimant's name in certain bank accounts in London, England (the "funds"). Claimant did not contest that the funds were proceeds of narcotics trafficking or money laundering activities occurring in part in the Eastern District, but did contend that the district court lacked in rem jurisdiction because of the absence of either actual or constructive control of the funds. The district court concluded that it had constructive control of the funds because of the demonstrated cooperation between the United States and the United Kingdom, including the seizure of the funds by British authorities pursuant to a restraining order and a subsequent judicial ruling upholding that order. See United States v. All Funds on Deposit in any Accounts Maintained in the Names of Meza or De Castro, 856 F.Supp. 759, 763 (E.D.N.Y.1994). Because we agree that the district court exercised the required constructive control over the funds, we affirm its judgment.
 
 BACKGROUND
 
 2
 In this civil forfeiture action, federal authorities targeted funds in several bank accounts at various financial institutions in London, England, all in the name of claimant or Heriberto Castro Meza, her late husband. The funds allegedly represented proceeds of an international drug trafficking and money laundering operation spearheaded by Jose Santacruz Londono ("Londono"), claimant's son-in-law and a leader of the Cali Cartel, who is currently a fugitive from justice in the United States believed to be residing in Colombia. Claimant is also a foreign national residing in Colombia. A significant amount of the trafficking and laundering occurred in the Eastern District of New York.
 
 
 3
 In July 1990, the government, through the Criminal Division of the Department of Justice, asked British authorities to restrain the funds based on its anticipated criminal prosecution of Londono and others and its corresponding criminal forfeiture proceeding against the funds in the Eastern District of New York. The government requested seizure of the funds pursuant to (1) the Agreement Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland Concerning the Investigation of Drug Trafficking Offenses and the Seizure and Forfeiture of Proceeds and Instrumentalities of Drug Trafficking, February 9, 1988, U.S.-U.K., 1989 WL 428726 (Treaty) (the "1988 Treaty"), and (2) the Drug Trafficking Offenses Act of 1986 (Designated Countries and Territories) Order 1990 (the "Drug Trafficking Offenses Act"). The British authorities cooperated and obtained an order dated July 30, 1990, from England's High Court of Justice, Queen's Bench Division, restraining the accounts (the "1990 High Court restraining order").
 
 
 4
 The United States government continued its efforts to prosecute Londono, but he remained a fugitive. In 1991, extradition arrangements between the United States and Colombia were terminated, rendering the prospect of trying Londono in this country highly unlikely.
 
 
 5
 On July 16, 1993, the government filed a complaint in the United States District Court for the Eastern District seeking civil forfeiture of the funds. On the same date, Chief Magistrate Judge Chrein executed an order directing the issuance of an arrest warrant in rem for the funds, which was issued on July 19. On September 8 and 16, 1993, a British constable, at the request of the United States Marshals Service, served the warrant and complaint on the various banks holding the funds, thereby attaching the funds for purposes of this action. At that time, the funds remained subject to the 1990 High Court restraining order.
 
 
 6
 On November 1, 1993, one month after filing a notice of claim to the funds, claimant moved in the district court to dismiss the complaint on the ground that the district court lacked in rem jurisdiction over the funds. Claimant asserted the district court lacked constructive control over the funds, in part because any forfeited funds would be deposited in the general fund of the United Kingdom. Simultaneously, claimant and her daughter (Londono's former wife) commenced an action in the High Court of Justice, Crown Office Division, seeking to discharge the 1990 High Court restraining order. In that action, claimant argued, among other things, that a restraining order could not continue based on a pending civil in rem forfeiture proceeding. The district court deferred its decision on claimant's motion to dismiss pending resolution of the British action, given that a resolution favorable to claimant might divest the district court of its jurisdiction. While the British action was pending, the district court issued a temporary restraining order and preliminary injunction prohibiting claimant from transferring the funds, and further issued an order authorizing the release of $100,000 of the funds to pay for claimant's legal expenses.
 
 
 7
 On March 18, 1994, the High Court issued a judgment upholding the 1990 High Court restraining order, claimant's appeal from which is currently pending. Shortly thereafter, the district court denied claimant's motion to dismiss and ordered the case to proceed to trial. Subsequently, claimant failed to comply with a court order demanding interrogatory answers and documents, at which time the government moved for summary judgment on the ground that claimant was collaterally estopped by a related action from contesting issues of probable cause or innocent ownership of the funds. Claimant did not oppose the government's motion.
 
 
 8
 The district court entered a Second Amended Final Judgment on May 25, 1994, granting summary judgment for the government based upon collateral estoppel. See generally United States v. All Funds on Deposit in Any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith, 801 F.Supp. 984 (E.D.N.Y.1992) (related action in which funds derived from the same source as funds in this action were deemed proceeds of drug trafficking and money laundering), aff'd sub nom. United States v. Daccarett, 6 F.3d 37 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994). Accordingly, the district court ordered forfeiture of the funds pursuant to 18 U.S.C. Sec. 981(a)(1)(A) and 21 U.S.C. Sec. 881(a)(6), and directed the Marshals Service to dispose of the funds "in accordance with all applicable laws, regulations, treaties and mutual legal assistance agreements."
 
 
 9
 On July 8, 1994, the district court issued a Memorandum and Order explaining its earlier denial of claimant's motion to dismiss for lack of in rem jurisdiction. See United States v. All Funds, 856 F.Supp. 759 (E.D.N.Y.1994). The district court first concluded that it had subject matter jurisdiction over the action and that venue was proper pursuant to the 1992 amendments to 28 U.S.C. Sec. 1355. The district court then separately addressed in rem jurisdiction, holding that it needed actual or constructive control of the funds to maintain the forfeiture action. More specifically, the district court held that in rem jurisdiction exists over property in a foreign country "if there is a seizure of the property that gives the court constructive control over the property, and if the seizure satisfies the traditional concerns of jurisdiction, namely enforceability of the judgment and reasonable probability of notice to the parties interested in the property." Id. at 763. Applying this standard, the district court concluded that it had constructive control of the accounts because of (1) the 1990 High Court restraining order issued solely in response to a request by federal authorities; (2) the 1994 High Court judgment affirming the restraining order; and (3) the general cooperation of the British authorities. Id.
 
 
 10
 Claimant now appeals from the Second Amended Final Judgment granting the government's motion for summary judgment.
 
 DISCUSSION
 
 11
 Claimant's principal argument on appeal is that the district court lacked in rem jurisdiction because it had neither actual nor constructive control of the funds. The fact that British authorities were cooperating with the United States government was insufficient, according to claimant, to afford the district court the required constructive control because the British authorities were not bound to remit the seized proceeds to the United States, even if the district court ordered forfeiture.
 
 1. Control under 28 U.S.C. Sec. 1355
 
 12
 Before addressing claimant's argument, we address the government's threshold contention that, based on recent amendments to 28 U.S.C. Sec. 1355, in rem jurisdiction is no longer required in actions seeking forfeiture of property located in a foreign country. The government asserts that "[b]ecause subject matter jurisdiction and venue are appropriate in the Eastern District of New York, the question of in rem jurisdiction becomes moot." Consideration of this argument requires a brief analysis of the development of Sec. 1355.
 
 
 13
 Prior to 1992, Sec. 1355 simply provided that district courts had subject matter jurisdiction over forfeiture proceedings commenced pursuant to the laws of the United States. It did not, however, authorize a district court to issue process against property not within its district. This limitation hindered the effectiveness of the forfeiture laws, as some courts concluded that district courts lacked in rem jurisdiction in actions where the property was located within the United States but outside the district in which the forfeiture action was brought. See United States v. Contents of Accounts Nos. 3034504504 and 144-07143, 971 F.2d 974, 983 (3d Cir.1992) (although forfeiture statutes provide for venue and subject matter jurisdiction, district court lacks in rem jurisdiction over property located in another district because service of process cannot be effected outside of the state in which the district is located), cert. denied, --- U.S. ----, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993); see also United States v. 51 Pieces of Real Property, Roswell, N.M., 17 F.3d 1306, 1310 (10th Cir.1994) ("To obtain jurisdiction over the property, the court must be able to execute service of process on it."). As a result, the government often had to file multiple forfeiture actions in different districts to satisfy these jurisdictional requirements.
 
 
 14
 In response to this shortcoming, Congress substantially amended Sec. 1355 in 1992. See generally United States v. One 1978 Piper Cherokee Aircraft, 37 F.3d 489, 492 (9th Cir.1994) (1992 amendments "unif[ied] the treatment of jurisdiction, venue and authority to serve process in civil forfeiture cases"). Section 1355(b) addresses venue in forfeiture actions, including proceedings against property located outside the United States:
 
 
 15
 (b)(1) A forfeiture action or proceeding may be brought in--
 
 
 16
 (A) the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred, or
 
 
 17
 (B) any other district where venue for the forfeiture action or proceeding is specifically provided for in section 1395 of this title or any other statute.
 
 
 18
 (2) Whenever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District [C]ourt for the District of Columbia.
 
 
 19
 In response to the inability of a district court to effect service outside of its state's borders, Congress enacted Sec. 1355(d), which provides that a district court "with jurisdiction over a forfeiture action pursuant to subsection (b) may issue and cause to be served in any other district such process as may be required to bring before the court the property that is the subject of the forfeiture action." This national service of process provision clearly conferred in rem jurisdiction on district courts in forfeiture proceedings with respect to property located within another judicial district in the United States. See United States v. $633,021.67, 842 F.Supp. 528, 531-32 (N.D.Ga.1993); United States v. Contents of Account No. 2033301, 831 F.Supp. 337, 340 (S.D.N.Y.1993). Prior to the district court's decision in the instant case, however, no published opinion had applied Sec. 1355 to property located in a foreign country.
 
 
 20
 As noted above, the government argues that Sec. 1355 as amended obviates the need for a district court to exercise any degree of control over property in order to sustain a forfeiture proceeding. It relies chiefly on the Senate Report in the legislative history regarding Sec. 1355(b)(2), which states:
 
 
 21
 [I]t is probably no longer necessary to base in rem jurisdiction on the location of the property if there have been sufficient contacts with the district in which the suit is filed. No statute, however, says this, and the issue has to be repeatedly litigated whenever a foreign government is willing to give effect to a forfeiture order issued by a United States court and turn over seized property to the United States if only the United States is able to obtain such order.
 
 
 22
 137 Cong.Rec. S16643 (1992) (citation omitted). According to the government, the only relevant inquiry under Sec. 1355 is whether any of the conduct giving rise to the forfeiture proceeding occurred in the district in which the action was commenced, even if the property is located in a foreign country.
 
 
 23
 We reject this argument. Although Congress certainly intended to streamline civil forfeiture proceedings by amending Sec. 1355, even with respect to property located in foreign countries, we do not believe that Congress intended to fundamentally alter well-settled law regarding in rem jurisdiction. The Supreme Court has recently affirmed the rule that " 'in order to institute and perfect proceedings in rem, ... the thing should be actually or constructively within the reach of the Court.' " United States v. James Daniel Good Real Property, --- U.S. ----, ----, 114 S.Ct. 492, 503, 126 L.Ed.2d 490 (1993) (quoting The Brig Ann, 13 U.S. (9 Cranch) 289, 291, 3 L.Ed. 734 (1815)). See also Republic Nat'l Bank of Miami v. United States, --- U.S. ----, ----, 113 S.Ct. 554, 559, 121 L.Ed.2d 474 (1992) ("the court must have actual or constructive control of the res when an in rem forfeiture suit is initiated"). This control is required in addition to the requirements of subject matter jurisdiction and venue. See, e.g., 51 Pieces of Real Property Roswell, N.M., 17 F.3d at 1310 ("Even if a district is the proper venue for a civil forfeiture action, the court cannot proceed unless it has jurisdiction over the defendant property."); Contents of Accounts Nos. 3034504504 and 144-07143, 971 F.2d at 980-81 (subject matter jurisdiction and venue are distinct from ability of court to serve process on property).
 
 
 24
 As noted above, by allowing nationwide service of process, newly adopted Sec. 1355(d) clearly provides districts courts with the required control over property located within the United States. Absent any degree of control over property located in a foreign country, however, a district court's forfeiture order directed against such property would be wholly unenforceable. See, e.g., David B. Smith, 1 Prosecution and Defense of Forfeiture Cases Sec. 9.01, at 9-5 n. 8 ("It could be argued based on the legislative history that Congress intended [Sec. 1355(b)(2) ] to operate only when a foreign government is willing to give effect to a forfeiture order issued by a United States court and turn over seized property ... [as t]hat is the only circumstance in which an American court could be said to have enough control over the property to direct its disposition."). Therefore, we conclude that in order to initiate a forfeiture proceeding against property located in a foreign country, the property must be within the actual or constructive control of the district court in which the action is commenced.
 
 
 25
 We next consider whether the district court in the instant case properly concluded that it had such control.
 
 2. Control over the Funds
 
 26
 The district court concluded that it had constructive control of the funds based on (1) the 1990 High Court restraining order (which was issued solely because of a request from federal authorities), (2) the 1994 High Court judgment affirming the restraining order, and (3) the general cooperation of the British authorities with respect to the funds. As the district court stated, "[s]eizure of the accounts in Great Britain with the assistance of the British government gave this court constructive control over the defendant funds. The opinion of the English High Court gives assurance that a judgment of forfeiture issued by this court would be enforced in England." 856 F.Supp. at 763.
 
 
 27
 Claimant argues that the district court lacked any degree of control because the United Kingdom was not obliged to remit to the United States the funds seized. The extent to which the United Kingdom may have cooperated in past forfeiture proceedings and expressed a clear intention to cooperate in this action is irrelevant, according to claimant, absent a legal entitlement of the United States to the funds, either pursuant to British law or a bilateral treaty. Constructive control would exist only "[h]ad the applicable law required that a portion of any confiscated proceeds be transferred to the United States."
 
 
 28
 As claimant correctly points out, the United Kingdom is not bound to remit to the United States any funds seized in connection with and in support of a forfeiture proceeding in this country. Pursuant to a mutual assistance treaty, the two countries have agreed to "assist each other in proceedings involving the freezing, seizure or forfeiture of the proceeds and instrumentalities of drug trafficking...." 1988 Treaty, Art. 10(1). Under the Treaty, a party "in control of forfeited proceeds or instrumentalities shall dispose of them according to its laws. Either Party may transfer forfeited assets ... to the other party, to the extent permitted by their respective laws...." Id. at Art. 10(3). Under British law, if and when an "external confiscation order" of a district court is registered and executed upon in the United Kingdom, any net sums remaining after the payment of certain specified sums "shall be paid into the Consolidated Fund," which is essentially a general treasury. See Drug Trafficking Offenses Act, Schedule 3, Sec. 12(7); see also id., Schedule 3, Sec. 26A. The government conceded at oral argument that the United Kingdom has the power to retain any funds seized and that the amount that the United States will receive ultimately will depend on negotiations between the two nations.
 
 
 29
 Notwithstanding the absence of a binding obligation on the part of the United Kingdom, we conclude that the district court correctly determined that it had constructive control of the funds by virtue of the demonstrated cooperation of the British government pursuant to the 1988 Treaty and the Drug Trafficking Offenses Act. As noted above, in 1990 the High Court issued a restraining order freezing the funds based solely on a request by the United States. See generally Drug Trafficking Offenses Act, Schedule 3, Sec. 13(2) (High Court's authority to restrain assets "shall be exercised with a view to recovering property which is liable to be recovered under an external confiscation order ... or ... with a view to making available for recovery property which may become liable to be recovered under any external confiscation order which may be made in the defendant's case"). Subsequently, in September 1993, at the request of the Marshals Service, British law enforcement officials served copies of the forfeiture complaint and warrant on those banks holding the funds. Furthermore, the 1990 High Court restraining order was continued by the High Court in 1994.
 
 
 30
 As the district court noted, the United Kingdom acted essentially as an agent of the United States for purposes of this forfeiture action. Every action of the British law enforcement officials has been in direct response to requests from federal authorities. Moreover, the government indicates that in at least two other separate proceedings, the United Kingdom has returned funds to the United States after registering and enforcing decrees of forfeiture entered by a district court.
 
 
 31
 We decline to adopt claimant's unduly narrow interpretation of constructive control, under which this history of demonstrated cooperation would be irrelevant, absent a binding obligation on the part of the United Kingdom to return the funds. In summary, although we do not today delineate the precise scope of what will constitute constructive control in future cases, we are satisfied that in the instant case the government has met its burden of demonstrating that the British government will turn over at least a portion of the seized funds to the United States, thereby vesting the district court with the requisite constructive control over the funds. See, e.g., Smith, Sec. 9.01 at 9-5 n. 8 ("If jurisdiction is challenged, the government should have the burden of showing that a forfeiture order will be enforced by the foreign government."). Accordingly, the district court properly asserted in rem jurisdiction in the instant case.
 
 CONCLUSION
 
 32
 Based on the foregoing, we affirm the judgment of the district court.