USA v. Technodyne LLC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2013

(Argued:  November 21, 2013                    Decided:  June 3, 2014)

Docket No. 12-4498

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

- v. -

TECHNODYNE LLC, PADMA ALLEN, REDDY ALLEN,

Claimants-Appellants,

ALL FUNDS AND OTHER PROPERTY ON DEPOSIT IN THE NINETEEN
BANK ACCOUNTS LISTED ON ATTACHMENT A, AND ALL PROPERTY
TRACEABLE THERETO, and ALL RIGHT, TITLE AND INTEREST IN THE
SEVEN PIECES OF REAL PROPERTY LISTED IN ATTACHMENT B, WITH
ALL IMPROVEMENTS, ATTACHMENTS AND EASEMENTS THEREON,

Defendants-in-rem.[*]
_____

Before:  KEARSE, JACOBS, and B.D. PARKER, Circuit Judges.

Appeal from judgments of the United States District Court for the Southern District

_____

[*]    The Clerk of the Court is directed to amend the official caption to conform with the above.

of New York, Thomas P. Griesa, Judge, for forfeiture of certain of the defendant properties to the United States, entered by default following an order pursuant to the fugitive disentitlement statute, 28 U.S.C. § 2466, striking claimants' claims to those properties.

Affirmed.

JUSTIN ANDERSON, Assistant United States Attorney, New York, New York (Preet Bharara, United States Attorney for the Southern District of New York, Andrew D. Goldstein, Assistant United States Attorney, New York, New York, on the brief), for Plaintiff-Appellee.

BARRY COBURN, Coburn & Greenbaum, New York, New York, for Claimants-Appellants.

KEARSE, Circuit Judge:

Claimants Technodyne LLC ("Technodyne"), Padma Allen (or "Padma"), and Reddy Allen (or "Reddy") (collectively "Claimants") appeal from judgments of the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge, ordering the forfeiture of 23 of the defendant funds and properties to the United States. The judgments were entered by default after the court granted the motion of the United States pursuant to the fugitive disentitlement statute, 28 U.S.C. § 2466, to strike Claimants' claims to the 23 properties on the ground that Padma and Reddy (collectively the "Allens") remained outside of the United States in order to avoid prosecution in a related criminal case. On appeal, Claimants argue principally that the district court applied an erroneous legal standard in determining their intent within the meaning of the statute and that it should not have determined that intent summarily in light of disputed questions of fact. For the reasons that

-2-

follow, we conclude that Claimants' contentions lack merit, and we affirm the judgments.

I. BACKGROUND

The Allens, who are United States citizens, are the founders and sole owners of Technodyne, a New Jersey-based information technology services company. Padma is Technodyne's president and chief financial officer; Reddy, her husband, is its chief executive officer. The present civil in rem forfeiture action, commenced in March 2012, is related to a criminal prosecution commenced against the Allens and Technodyne by a superseding indictment filed in June 2011 ("Indictment"). The following facts, drawn from the record below and the parties' submissions on appeal, are largely undisputed.

A. The Alleged Scheme To Defraud

The Indictment charges the Allens, Technodyne, and others with, inter alia, conspiracy to commit (a) wire fraud, (b) bribery, and (c) money laundering in a scheme to defraud the City of New York (the "City") of hundreds of millions of dollars in connection with its project, called "CityTime," to modernize the payroll system covering City employees. The Indictment alleges, inter alia, as follows.

"CityTime was originally budgeted to cost the City $63 million to complete, but" by June 15, 2011, it "ha[d] cost the City approximately $700 million." (Indictment ¶ 1.) "[W]ell over $600 million" of that amount was paid to the project's prime contractor and "was tainted, directly or indirectly, by fraud." (Id. ¶ 10.) The costs were inflated principally by means of fraudulent overbilling

by Technodyne. (See id. ¶¶ 10-11, 18.)

Technodyne, beginning in 2003, was the primary subcontractor on CityTime, employed to provide staffing services; from 2003 through 2010, the prime contractor agreed to pay Technodyne at least $450 million in connection with the project. (See id. ¶¶ 7, 12, 18.) Technodyne paid tens of millions of dollars in kickbacks to employees of the prime contractor and to the principal representative of the City agency that was responsible for overseeing CityTime, making such payments through, inter alia, sub-subcontractors, shell companies, and foreign bank accounts to launder the money. (See, e.g., id. ¶¶ 3-6, 13-15, 21-23.)

B. The Events of 2010-2011

On or about December 15, 2010, Padma, Reddy, and Technodyne were served with grand jury subpoenas requiring them to testify and produce documents relating to CityTime and several individuals and entities, including Technodyne, Padma, and Reddy themselves. Also on or about December 15, 2010, six persons, not including the Allens, were arrested in connection with the CityTime scheme.

The Allens did not appear before the grand jury. On January 27, 2011, Padma had an informal meeting with federal and local law enforcement officials. In that meeting, accompanied by her then-attorney, Mark Lerner (who also represented Reddy and Technodyne), Padma answered questions about certain companies affiliated with the Allens and Technodyne. However, on the advice of counsel, she did not answer questions about Technodyne's work on CityTime.

In mid-February 2011, Padma left the United States for India. In early March 2011, Reddy left the United States for Indonesia and then India.

-4-

On or about April 11, 2011, the government served another set of grand jury subpoenas on the Allens through Lerner, requiring testimony and documents. An Assistant United States Attorney ("AUSA") had "discussions with Mr. Lerner regarding whether Reddy Allen and Padma Allen would appear to testify before the grand jury or otherwise meet with the Government to answer questions about the CityTime Project." (Declaration of AUSA Howard S. Master dated September 4, 2012 ("Master Declaration" or "Master Decl."), ¶ 5.) In response, in letters attested as "Acknowledged and agreed" by Padma and Reddy respectively, Lerner informed AUSA Master that both Padma and Reddy, "if questioned in the grand jury, would assert [their] Fifth Amendment right[s] and decline to testify as to all relevant matters." (Letters from Mark W. Lerner to AUSA Master dated April 19, 2011.)

On May 26, 2011, the government froze the assets in bank accounts belonging to the Allens or Technodyne. The Allens learned of the freeze around that time, and suspended Technodyne's operations on May 31.

The Indictment charging the Allens and Technodyne was issued on June 15, 2011. The Indictment was unsealed on June 17, and warrants for the Allens' arrest were issued. The Allens and Technodyne retained new counsel to represent them in the criminal case; but neither Padma nor Reddy has returned to the United States.

The Allens' new attorneys, Barry Coburn and Dennis Edney, met with government attorneys in August and December 2011. At the first meeting, the subject of pretrial release for the Allens was discussed. (See, e.g., Master Decl. ¶ 8 ("among other topics discussed, Messrs. Coburn and Edney asked if there was a way that Reddy Allen and/or Padma Allen could be granted release if they returned to the United States in an attempt to resolve the criminal charges against them").)

There followed an August 29, 2011 letter from Coburn to the government stating as follows:

> I am writing to follow up on our meeting with you. We look forward to continuing our discussions with you. In order to facilitate those discussions, it is our intention to talk, in person, with our clients about the possibility of an early resolution of the indictment, along the lines explored during our meeting with you. In particular, we will pursue the possibility of our clients coming to New York in order to resolve extradition issues here. We hope, ultimately, to be able to enter into a global resolution of all pending criminal matters.
>
> . . . .
>
> . . . [W]e will look forward to talking further with you about the possibility of release of the clients' frozen funds, which also could significantly facilitate our ability to move this dialogue forward. We request that you consider a limited release of funds in the very near future, since this would substantially assist us in arranging an in-person conversation with our clients. Our experience is that in sensitive matters like this, only in-person discussions will serve to convey the necessary information.

(Letter from Barry Coburn to AUSAs Master and Andrew Goldstein dated August 29, 2011, at 1-2 (emphasis added).)

The possibility of bail was also raised by the Allens' counsel at their December 2011 meeting with the prosecutors: "Messrs. Coburn and Edney again raised the issue of what the conditions of release could be if Reddy Allen and/or Padma Allen returned to the United States to face the criminal charges against them." (Master Decl. ¶ 10; see Declaration of Dennis Edney dated September 18, 2012 ¶ 10 ("the prosecutors turned the conversation around to my clients pleading guilty or returning to the United States" and "I asked hypothetically what bail conditions they would consider if that occurred").)

C. The Present Forfeiture Proceeding

In March 2012, the government filed its verified complaint ("Complaint") in the

present civil forfeiture action seeking, pursuant to, inter alia, 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(D), a decree that the real properties and the contents of the bank accounts named as in rem defendants were forfeited to the United States as "property . . . which constitutes or is derived from proceeds traceable to," id. § 981(a)(1)(C)--or "which represents or is traceable to the gross receipts obtained . . . from," id. § 981(a)(1)(D)--the criminal acts alleged in the June 2011 Indictment. The Complaint named 19 bank accounts and 7 real properties, valued at approximately $4.7 million and more than $6.8 million, respectively. It alleged that "[b]ecause Reddy Allen and Padma Allen are fugitives from justice, the Government intends to seek forfeiture of the DEFENDANT ACCOUNTS and the DEFENDANT PROPERTIES pursuant to the Fugitive Disentitlement Statute, 28 U.S.C. § 2466." (Complaint ¶ 82.)

In April 2012, Padma and Reddy filed claims, on behalf of themselves and Technodyne, opposing the requested forfeiture. Collectively, they asserted interests in 17 of the 19 bank accounts and 6 of the 7 real properties. The government moved to strike their claims on the ground that, as the Allens were fugitives, the Allens and Technodyne were not entitled to pursue their claims.

In response to the government's motion to strike, the Allens submitted declarations stating, inter alia, that they had left the United States in 2011 on business trips, prior to any charges against them and without knowing they were targets of the government's CityTime investigation. (See Declaration of Padma Allen dated August 19, 2012 ("First Padma Decl."), ¶¶ 16-17; Declaration of Reddy Allen dated August 19, 2012 ("Reddy Decl."), ¶¶ 15-16; Hearing Transcript, October 18, 2012 ("Hearing Tr." or "Tr."), at 7 (the Allens' counsel stating that "[i]t is their testimony through their declarations that they did not know that that investigation was focused on them in particular at the

time they left").) Padma stated that the purpose of her mid-February trip had been to address the resignation of a senior Technodyne executive based in India. (See First Padma Decl. ¶ 17.) Reddy stated that the purpose of his March trip had been, first, to investigate potential business opportunities in Indonesia and India, and then to assist his wife with the personnel matter in India. (See Reddy Decl. ¶ 15.)

In parallel assertions (collectively "Allens' Decls."), the Allens stated that they had not left the United States in order to avoid prosecution. (See Allens' Decls. ¶ 25.) They stated that they had continued to communicate with prosecutors through their attorney, providing the government with roughly 2.5 million pages of documents, and revealing to authorities the extent of Technodyne's pending payables to its CityTime sub-subcontractors. (See id. ¶¶ 13, 15.) They stated that they had left behind multiple properties, as well as "several valuable personal items," and had not liquidated personal or Technodyne assets. (Id. ¶ 19.)

The Allens also pointed out that when they left the United States in early 2011, their daughter and son, then eighth- and ninth-graders, respectively, remained in the United States in the care of their housekeeper and Reddy's parents; the Allens had made no other arrangements for their children at that time. (See Allens' Decls. ¶¶ 19, 23.) The Allens stated that after they learned their assets had been frozen by the government, leaving them with "no capacity or means to have the children continue to live in the United States and continue their education," they sent for the children, "beg[ging] friends and family members to arrange for [the children's] travel to India." (Id. ¶ 23.) The children left New Jersey on May 29, three days after the asset freeze; as that was before their final exams, they received credit for only half of the school year. (See id.)

The Allens stated that they remained in India after being indicted because they lacked

the ability to work and to support themselves and their children in the United States. They stated that all the negative publicity following their indictment has made them unemployable; and the government's freezing of their assets has left them unable to start a new business. (See Allens' Decls. ¶¶ 26-27.) They stated that they remained in India in order to be supported by family and friends. (See id. ¶¶ 29-30.)

In reply to the Allens' declarations, the government submitted, inter alia, the Master Declaration, which principally recounted contacts and communications between the government and the Allens or their attorneys as described in Part I.B. above. Master stated in addition that Padma, on the advice of counsel at her January 2011 meeting with federal and local law enforcement officials, "did not answer questions about Technodyne's work on the CityTime Project"; and "[w]ith regard to the questions that Ms. Allen answered, . . . [she] made false statements" about certain entities including McCreade Software Asia Pvt. Ltd. ("McCreade"). (Master Decl. ¶ 4.) The Master Declaration stated that

> "[i]n her interview, ALLEN stated that TECHNODYNE's business transactions with affiliated entities, including Kaveri and McCreade, were entirely proper and had legitimate business purposes. In truth and in fact, however, and as PADMA ALLEN well knew, many of TECHNODYNE's transactions with Kaveri and McCreade were wire transfers of funds made to conceal the payments of kickbacks to [two employees of the prime contractor]."

(Id. (quoting Indictment ¶ 56).)

With respect to the Allens' assertions that the freezing of their assets in the United States had left them financially unable to return to the United States, the government pointed out that the asset freeze did not cover millions of dollars the Allens and Technodyne had sent to India prior to May 26, 2011. (See Government's Reply Memorandum of Law in Support of Its Motion To Strike

-9-

the Claims of Padma Allen, Reddy Allen, and Technodyne ("Government Reply Memorandum") at 8.) The government submitted a sworn declaration from Yuval Hibshoosh, Associate Commissioner of the New York City Department of Investigation, which stated that after the initial CityTime-related arrests in December 2010, a total of "more than $10.4 million was transferred from Technodyne's U.S. accounts to McCreade's accounts in India," including $4.8 million in May 2011 (Declaration of Yuval Hibshoosh dated September 4, 2012 ("Hibshoosh Declaration"), ¶ 4). The Hibshoosh Declaration stated that "McCreade's accounts are in the name of Padma Allen's mother, and bank records show that the transfers from Technodyne's accounts to McCreade's accounts were done at Padma Allen's direction." (Id. ¶ 3.)

In response to the government's reply submissions, Padma submitted a new declaration that, inter alia, took issue with the Master Declaration, reiterating that she and Reddy had been fully cooperative with the government. (See Declaration of Padma Allen dated September 18, 2012 ("Second Padma Decl."), ¶¶ 5-6, 8.) She did not deny having refused to answer questions about Technodyne's work on CityTime, but she said that some of the questions were not part of the agreed-upon scope of the questioning and that the government's "claim about me not answering certain questions was incorrectly stated as non-cooperative behavior on my part." (Id. ¶ 6.)

In response to the Hibshoosh Declaration, Padma did not deny that between mid-December 2010 and late May 2011 Technodyne had sent more than $10.4 million to McCreade's accounts in India; she said the government had "mischaracterized these events" (id. ¶ 10). She stated that all of the payments had been made in the regular course of Technodyne's business and were made "prior to any formal criminal charges filed against Reddy Allen, TechnoDyne, and myself." (Id.) Padma stated that "[g]iven the negative publicity in the worldwide media regarding TechnoDyne,

-10-

McCreade pressured TechnoDyne to render all due and past-due payments immediately." (Id. ¶ 12.) She did not deny that the McCreade accounts were held in the name of her mother.

At the October 18, 2012 oral argument on the government's motion to strike, counsel for the Allens and Technodyne largely reiterated the assertions made in the Allens' declarations. (See Hearing Tr. 2-9.) Counsel admitted, inter alia, that after leaving the United States, the Allens had invoked their Fifth Amendment privileges against self-incrimination in response to grand jury subpoenas served on their attorney while they were abroad (see id. at 4, 6), and that, having left the United States on business trips in early 2011, the Allens had not returned to the United States to face the charges in the Indictment (see id. at 6-7). In response to the court's question as to when the Allens would return, counsel stated that he had no answer. (See id. at 7.) In response to the court's statement that "there's no indication that they intend to come back" (id.), counsel did not answer directly and argued that under the plain language of the fugitive disentitlement statute, that statute could not be applied unless there was "proof analogous to specific inten[t], that they left and remained abroad in order to avoid criminal prosecution" (id. at 7-8). Counsel argued that there was no evidence to contradict the assertions in the declarations by the Allens that they "remain [abroad] because they're no longer able to earn an income in the United States and their reputations have been tarnished and so on," "and that all the circumstances do not allow the government to carry its burden under the summary judgment standard." (Id. at 8.)

At the close of the hearing, at which the government rested on its written submissions, the district court found that "the Allens [were] deliberately avoiding prosecution by declining to enter or reenter the United States and be subject to the jurisdiction of the United States." (Tr. 11; see also id. at 8 ("It seems to me that the circumstantial evidence is so strong.").) The court found that

-11-

the essential facts are that the Allens left the United States, one in February 2011, the other in March 2011. There was a criminal investigation going on and there was an indictment in June, and they have not returned, despite the fact they had a home here, maybe even two homes, and they have not returned. And the circumstantial evidence at the very least is overwhelming to support the idea that they had notice or knowledge of the fact that there was a warrant or process for their apprehension, and they have remained outside of the United States in order to avoid criminal prosecution.

(Id. at 10-11; see also id. at 6-7 ("[T]here's been a lot of time, and I really just don't see that there's any real issue here about the timing. How could the timing make anything clearer? They are under criminal investigation, and they were indicted, and people who had been here before suddenly leave and don't return, that's the stark fact.").) Finding the other elements of § 2466 satisfied as well, the court concluded that the government's motion for disentitlement should be granted. (See id. at 11; see also id. at 12 (same as to the claims of Technodyne).)

Thereafter, a written order was entered granting the government's motion to strike the claims of the Allens and Technodyne to the 17 bank accounts and the 6 parcels of real property in which they asserted interests. See Order dated October 22, 2012 ("October 2012 Order"); id. at 5 ("For the reasons set forth on the record at the October 18, 2012 oral argument in this matter, Claimants' Claims and Amended Claims are stricken and dismissed pursuant to Title 28, United States Code, Section 2466, and Claimants' Answer is dismissed."). Default judgments of forfeiture as to the properties in which Padma, Reddy, or Technodyne had asserted an interest were entered on January 3, 2013, May 9, 2013, and August 7, 2013. The Allens and Technodyne filed an original notice of appeal in November 2012, following entry of the October 2012 Order striking their claims; they filed amended notices of appeal following entry of each of the default judgments.

## II. DISCUSSION

-12-

On appeal, the Allens and Technodyne contend principally that the district court made two errors of law in applying the fugitive disentitlement statute to them. First, they argue that the court erred in failing to rule that disentitlement is inappropriate unless a claimant "specifically intend[s] to avoid prosecution" (Claimants' brief on appeal at 8) and avoidance of criminal prosecution is the claimant's "sole or principal reason for leaving the jurisdiction, and remaining abroad" (id. at 3 (emphasis added); see also id. at 9 (arguing that avoidance of prosecution must be claimant's "dominant intent"); id. at 19-20, 37-38). Second, they contend that, in determining whether the Allens had such intent, the court erred in "weighing the evidence," rather than applying a "summary judgment" standard and drawing all permissible evidentiary inferences in favor of the Allens and Technodyne. (Id. at 20-21; see also id. at 35-36.)

The government opposes these contentions and argues not only that factfinding by the court was appropriate, but also that because the government had moved to strike Claimants' claims pursuant to, inter alia, Rule G(8)(c) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (hereinafter "Forfeiture Action Rules"), Claimants bore the burden to show that the Allens' refusal to return to the United States was without any intent to avoid prosecution, see Forfeiture Action Rule G(8)(c)(ii)(B). The government argues that the Allens failed to establish that they lacked such an intent.

For the reasons that follow, we reject the government's contention that the burden of proof as to intent under the fugitive disentitlement statute was on Claimants. However, we also reject Claimants' contentions (a) that summary judgment standards were applicable, and (b) that the court was required to find that avoidance of criminal prosecution was the Allens' sole, dominant, or principal reason for remaining outside of the United States. We conclude that the district court's

findings were not clearly erroneous and that its application of the fugitive disentitlement statute was well within the bounds of its discretion.

A.  The Requirements for Fugitive Disentitlement

The fugitive disentitlement statute, 28 U.S.C. § 2466, confers upon a court the discretion to bar certain individuals or entities from raising claims contesting civil forfeiture actions. It is designed to prevent

> the unseemly spectacle recognized by the Supreme Court in Degen [v. United States, 517 U.S. 820 (1996),] and by this court in [United States v.] Eng[, 951 F.2d 461 (2d Cir. 1991),] of a criminal defendant who, facing both incarceration and forfeiture for his misdeeds, attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction.

Collazos v. United States, 368 F.3d 190, 200 (2d Cir. 2004) ("Collazos").  The statute provides, in pertinent part, as follows:

> (a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action . . . upon a finding that such person--

> > (1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution--

> > > (A) purposely leaves the jurisdiction of the United States;

> > > (B) declines to enter or reenter the United States to submit to its jurisdiction; or

> > > (C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and

> > (2) is not confined or held in custody in any other jurisdiction

-14-

for commission of criminal conduct in that jurisdiction.

(b) Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies.

28 U.S.C. § 2466 (emphases added). As we noted in Collazos,

the statute identifies five prerequisites to disentitlement: (1) a warrant or similar process must have been issued in a criminal case for the claimant's apprehension; (2) the claimant must have had notice or knowledge of the warrant; (3) the criminal case must be related to the forfeiture action; (4) the claimant must not be confined or otherwise held in custody in another jurisdiction; and (5) the claimant must have deliberately avoided prosecution by (A) purposefully leaving the United States, (B) declining to enter or reenter the United States, or (C) otherwise evading the jurisdiction of a court in the United States in which a criminal case is pending against the claimant.

Collazos, 368 F.3d at 198 (emphases added). The claimant's intent may be assessed in light of "the totality of [the] circumstances." Id. at 201.

We review the legal applicability of § 2466 de novo. See Collazos, 368 F.3d at 195. However, given § 2466(a)'s use of the phrase "may disallow" (emphasis added), "the ultimate decision whether to order disentitlement in a particular case rests in the sound discretion of the district court," Collazos, 368 F.3d at 198. Thus, "we review the district court's decision to order disentitlement for abuse of discretion." Id. at 195. "An abuse of discretion may consist of an erroneous view of the law, a clearly erroneous assessment of the facts, or a decision that cannot be located within the range of permissible decisions." SEC v. Razmilovic, 738 F.3d 14, 25 (2d Cir. 2013), cert. denied, 134 S. Ct. 1564 (2014).

The district court in Collazos's case found "that Collazos ha[d] intentionally evaded and refused to submit to the jurisdiction of" the United States based on the fact that, knowing of the criminal prosecutions pending against her in 2001,

-15-

Collazos had her attorney contact the United States Attorney's Office while she remained in Col[o]mbia and insist on pre-trial release as a condition of her reentering the country and voluntarily submitting to the court's jurisdiction.

United States v. Contents of Account Number 68108021 Held in the Name of Stella Collazos, 228 F.Supp.2d 436, 443 (S.D.N.Y. 2002) (emphasis added); see id. at 438 ("Collazos would consider entering the United States and voluntarily submitting to the jurisdiction of the federal court in Florida so long as she was granted pre-trial release in exchange"); id. at 442 (Collazos "might agree to voluntarily submit to the jurisdiction of the Florida court were the government to agree to the condition of pre-trial release").  The district court found that the insistence on bail as a condition for Collazos's return to face the federal charges, revealing her refusal to return to face prosecution except on her own terms, sufficed to show that Collazos remained outside of the United States with the intent to avoid prosecution.  See id. at 443.  The court also noted that the intent requirement was "further satisfied" by Collazos's earlier refusal to enter the United States after learning of a Texas warrant for her arrest, the existence of which had "served as the primary reason given by her prior counsel . . . for being unable to attend her noticed deposition in the instant case in July of 1999."  Id.

This Court, in affirming the district court's order disentitling Collazos to oppose forfeiture, found that "the record amply supports the conclusion that all five statutory requirements for forfeiture were satisfied"; "the totality of circumstances indicates that Ms. Collazos made a conscious choice not to 'enter or reenter the United States' to face the criminal charges pending against her."  Collazos, 368 F.3d at 201.

B.  The Government's Arguments as to Standing and Burden of Proof

The government contends, because its motion for disentitlement cited not only

-16-

28 U.S.C. § 2466 but also Forfeiture Action Rule G(8)(c), which governs forfeiture in rem actions arising from a federal statute, see Forfeiture Action Rule G(1), that Claimants bore the burden to show "standing under the Fugitive Disentitlement Statute," i.e., to prove that the statute was not applicable to them (Government brief on appeal at 19-20). Although Rule G(8)(c) provides that, on a government motion to strike a claim opposing forfeiture, the court is to determine "whether the claimant can carry the burden of establishing standing by a preponderance of the evidence," Forfeiture Action Rule G(8)(c)(ii)(B), we reject the government's standing and burden-of-proof contentions here for a number of reasons.

First, the government did not adequately present these arguments in the district court. It cited Rule G(8)(c) at the outset of its initial memorandum in support of its motion to strike Claimants' claims on the ground that Claimants fell squarely within the fugitive disentitlement statute. (See Government's Memorandum of Law in Support of Its Motion To Strike the Claims of Padma Allen, Reddy Allen, and Technodyne at 2.) But the memorandum did not describe the challenge as one to standing; none of the submissions by the government in support of its motion mentioned either standing or burden of proof.

Claimants, in contrast, both in their written submissions opposing the government's motion to strike and in oral argument to the district court, repeatedly argued that the government had the burden of proof. (See, e.g., Claimants Padma Allen, Reddy Allen, and Technodyne's Opposition to the Government's Motion To Strike ("Claimants' Initial Memorandum in Opposition") at 7 ("The government bears the burden of making a showing as to each of the factors required under the statute." (emphasis added)); see also id. at 4, 13; Claimants Padma Allen, Reddy Allen, and Technodyne's Corrected Surreply in Opposition to the Government's Motion To Strike at 2 (the

-17-

government has not "carr[ied] its burden of demonstrating that the Allens' reason for being in India is to avoid criminal prosecution in the United States" (emphasis in original)); id. at 3, 9; Hearing Tr. 10 ("I do not believe the government . . . can carry the requisite burden"); id. at 8.) Neither in its motion papers nor at oral argument did the government respond to Claimants' arguments that the government bore and had not met the burden of proof. The government made no mention of burden of proof at all. It is unsurprising, therefore, that the district court, while noting that the government had moved under both § 2466 and Rule G(8)(c), ordered disentitlement only pursuant to § 2466. See October 2012 Order at 4-5.

Second, we doubt that the government's present argument as to standing and burden of proof has a sound foundation in Rule G(8)(c). The Advisory Committee Note accompanying that Rule indicates that "standing" in this context refers to "claim standing." See Forfeiture Action Rule G(8)(c) Advisory Committee Note (stating that the Rule "governs the procedure for determining," but "does not address the principles that govern[,] claim standing"). While the meaning of "claim standing" is somewhat obscure on its face, it appears that the drafters intended to denote a claimant's "standing to contest forfeiture," Forfeiture Action Rule G(8)(a) Advisory Committee Note (contrasting "standing to contest forfeiture" with "standing to seek suppression"); Forfeiture Action Rule G(8)(b)(i) ("A claimant who establishes standing to contest forfeiture may move to dismiss the action under Rule 12(b)."). In general, "[i]n order to contest a governmental forfeiture action, claimants must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution as required for any action brought in federal court." United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999). Litigants have Article III standing if they "have suffered an injury in fact" that is "fairly . . . trace[able] to the challenged action" and "likely . . . [to be] redressed

-18-

by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). Litigants have statutory standing to oppose forfeiture in a civil in rem proceeding commenced by the government if they "claim[] an interest in the seized property[,] . . . asserting [that] interest in the property in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims." 18 U.S.C. § 983(a)(4)(A).

The record in the present case belies any notion that the Allens or Technodyne lack statutory or Article III standing to oppose forfeiture of the 23 defendant properties at issue here. The government has not alleged any failure by the Allens or Technodyne to comply with the Forfeiture Action Rules. And the government's Complaint itself alleges that each of the bank accounts is held in the name or names of Padma, Reddy, Technodyne, or a Technodyne affiliate. (See Complaint ¶¶ 16, 18, 20, 22, 26, 28, 30, 32, 34, 36, 38, 40, 42, 46, 48.) The Complaint also alleges that the relevant parcels of real property were purchased--with the proceeds of their crimes--by the Allens. (See id. ¶¶ 50-61.) We thus reject the government's challenge to Claimants' standing to contest forfeiture.

Nor do we see any indication that Congress intended to place on a claimant the burden of proof with respect to the factual prerequisites set out in the fugitive disentitlement statute. As a general matter, a party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue. See generally 9 J. Wigmore, Evidence § 2486 (Chadbourne rev. 1981). For a court to order disentitlement under § 2466, several facts must be found, including that "a warrant or similar process [was] issued in a criminal case for the claimant's apprehension"; that "the claimant . . . had notice or knowledge of the warrant"; that "the criminal case [is] related to the forfeiture action," and so forth. Collazos, 368 F.3d at 198. These are affirmative

-19-

facts, as to which the government presumptively has access to proof. There can be no serious suggestion that a claimant should have the burden of proving the negatives of such matters, e.g., of proving that there in fact was no warrant for his arrest. Nor is there any basis for assuming that while the government has the burden of proof as to, e.g., whether it has issued a warrant, the claimant has the burden of proof on the issue of the intent with which he declines to enter or reenter the United States. Where Congress intends a statute to allocate the burden of proof to different parties on different issues, it does so expressly. For example, § 983, which sets out general rules governing civil forfeiture proceedings, provides that "the burden of proof is on the Government to establish . . . that the property is subject to forfeiture," 18 U.S.C. § 983(c)(1), but that a claimant asserting innocence "shall have the burden of proving that the claimant is an innocent owner," id. § 983(d)(1). Section 2466 contains no specification or parsing of the burden of proof, and we conclude that where the government moves for disentitlement of a claimant, it bears the burden of establishing the factual prerequisites laid out in that statute.

C. Claimants' Invocation of Summary Judgment Standards

As to the district court's determination that the Allens remained outside of the United States in order to avoid criminal prosecution, Claimants challenge that ruling in part on the basis that the court "weigh[ed] the evidence," rather than applying a "summary judgment" standard and drawing all permissible evidentiary inferences in favor of Claimants. (Claimants' brief on appeal at 20-21.) In support of its contention that this was error, Claimants rely principally on the decision of the District of Columbia Circuit in United States v. $6,976,934.65, Plus Interest, 554 F.3d 123 (D.C. Cir. 2009) ("$6,976,934.65, Plus Interest"), and a decision of the Sixth Circuit relying on that case, to wit,

United States v. Salti, 579 F.3d 656 (6th Cir. 2009). The D.C. Circuit Court in $6,976,934.65, Plus Interest ruled that the district court in that case had erred in granting summary judgment on the government's motion for disentitlement under § 2466 despite the existence of genuine factual disputes. See 554 F.3d at 133. We are not persuaded that adherence to summary judgment standards in a § 2466 proceeding is appropriate.

Preliminarily, we note that in $6,976,934.65, Plus Interest, the government had made a motion in the district court for summary judgment, see United States v. $6,976,934.65 Plus Interest, 520 F.Supp.2d 188, 190 (D.D.C. 2007) ("Now before the Court comes plaintiff, the United States' motion . . . for summary judgment."). The D.C. Circuit thus dealt with the matter as it stood: an appeal from summary judgment. In the present case, the government did not move for summary judgment.

More importantly, we conclude that the fugitive disentitlement statute--which, unlike Forfeiture Action Rule G(8)(c), does not mention summary judgment--is not meant to address a claim or defense on its merits; it provides an ancillary basis for disallowing a claim, and it contains provisions that are incompatible with fundamental principles governing summary judgment. First, in dealing with a request for summary judgment "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); see, e.g., Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 156 (2d Cir. 2009) ("On a motion for summary judgment, the court is to identify factual issues, not to resolve them."). In contrast, the fugitive disentitlement statute provides that the "judicial officer" may disallow a person or entity from using the resources of the federal courts "upon a finding," 28 U.S.C. § 2466(a), that the factual prerequisites to disentitlement set out in that section

are met. Since the judge is explicitly required to make findings of fact, determinations as to disentitlement are not to be made under the standards governing summary judgment.

Second, summary judgment is appropriate when, there being no genuine dispute as to any material fact, the undisputed facts show that the moving party is entitled to judgment in its favor "as a matter of law," Fed. R. Civ. P. 56(a). Rule 56 states that upon such a showing, "[t]he court shall grant summary judgment . . . ." Id. (emphasis added). The fugitive disentitlement statute, however, even where the district court has found the government to have established all five of the factual prerequisites, provides only that the court "may disallow" the fugitive's pursuit of the claim. 28 U.S.C. § 2466(a) (emphasis added); see also id. § 2466(b) ("Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies." (emphasis added)). Accordingly, the court has discretion not to order disentitlement, see, e.g., Collazos, 368 F.3d at 195, 198, and the government is thus never entitled to prevail under § 2466 strictly as a matter of law. We conclude that Congress did not intend summary judgment standards to apply.

However, we do not interpret the provision that disentitlement may be ordered only after the court has made the requisite findings of fact to mean that disentitlement can properly be ordered only after a trial with live witnesses. As the objective of the statute is to "disallow [fugitive claimants] from using the resources of [United States] courts . . . in furtherance of" their opposition to forfeiture, 28 U.S.C. § 2466(a), and as the ultimate decision as to whether to order disentitlement lies within the court's discretion, we view the district court as having considerable discretion also to determine the nature of the necessary hearing on a disentitlement motion. In Collazos, we affirmed a disentitlement order entered "[a]fter extensive briefing, evidentiary submissions, and oral argument,"

-22-

368 F.3d at 195. We noted that, "because statutory disentitlement is itself preceded by notice and hearing, and because such disentitlement does not impose a punishment but rather creates an adverse presumption that a claimant can defeat by entering an appearance in a related criminal case, . . . § 2466 does not violate due process by depriving a forfeiture claimant of property without a hearing." 368 F.3d at 205.

In the present case, the district court received numerous submissions from both sides on the issue of the Allens' reasons for remaining outside of the United States, including several declarations from the Allens; and it heard extensive argument from their attorney based on the factual assertions in those declarations. Claimants' attorney, while asking the court to accept those assertions in the light most favorable to Claimants, did not suggest that the Allens had any additional factual assertions they wished to make. And, plainly, Claimants did not seek a proceeding at which the Allens would testify in person. The court had discretion to make the findings required by § 2466(a) on the basis of the parties' presentations; and it was not required to accept as true the assertions made by the Allens.

D. The Nature of the "in order to" Requirement

With respect to the factual prerequisites for application of the fugitive disentitlement statute, Claimants' challenge focuses on the district court's finding that the Allens declined to reenter the United States "in order to avoid criminal prosecution," 28 U.S.C. § 2466(a)(1)(B). Claimants argue that "[t]he Allens have offered alternative reasons for their intent to leave and remain outside of the jurisdiction, which . . . warranted a denial of the government's motion to strike." (Claimants' brief on appeal at 19.) According to Claimants,

-23-

[t]he ultimate import of the "in order to" requirement is that the government must show and the court must find a deliberate and <u>purposeful</u> intent, <u>which appears to approximate specific intent</u>, <u>to leave</u> the jurisdiction <u>and remain</u> outside of it for <u>the</u> purpose of evading jurisdiction. Applying the "in order to" standard requires more than a mere invocation of the words of the statute. It requires a rigorous evaluation of intent . . . . The paucity of factual findings to support the district court's ruling suggests that though the district court stated the terms "in order to" in making its ruling, it did not, as a matter of application, utilize the correct standard. Instead, . . . the district court appears to have predicated its holding largely on finding that the Allens had notice of the indictment and otherwise remain outside of the jurisdiction.

(<u>Id</u>. at 19-20 (emphases added); <u>see</u>, <u>e.g.</u>, <u>id</u>. at 3 (arguing that the avoidance-of-prosecution purpose must be the "sole or principal" purpose).) While we accept that the "in order to" provision requires proof of a particular intent, we disagree that that intent must be proven to be the sole, principal, or dominant intent. And we reject Claimants' characterization of, and sufficiency challenge to, the district court's factual finding as to the Allens' intent.

Preliminarily, we note that the district court was not required to find that the Allens intended to avoid criminal prosecution both by "<u>leav[ing]</u> the jurisdiction <u>and</u>" by "remain[ing] outside of it" (Claimants' brief on appeal at 19 (emphases added)). The statute sets out leaving and declining to reenter separately and, by grammatical implication, disjunctively. Even if a departure was motivated by reasons that did not include the avoidance of criminal prosecution, a claimant may be barred from contesting forfeiture if he or she declines to reenter the United States in order to avoid prosecution. The district court found that the Allens were aware of the investigation when they left the United States (<u>see</u> Tr. 10-11), and it was entitled to take that awareness into account in considering the totality of the circumstances. The court's ultimate explanation for ordering disentitlement was that "they have <u>remained</u> outside of the United States in order to avoid criminal prosecution" (<u>id</u>. at 11 (emphasis added)). That finding as to the intent with which the Allens declined to reenter the United

-24-

States sufficed under § 2466(a)(1).

Moreover, the court plainly did not ignore the Allens' motivations and predicate its order of disentitlement on the bare fact that the Allens remained outside of the United States after having notice of the indictment and arrest warrants. The court found that "the Allens are deliberately avoiding prosecution by declining to enter or reenter the United States and be subject to the jurisdiction of the United States." (Tr. 11 (emphasis added).)

We agree with Claimants that the government was required to prove that the Allens remained outside of the United States with the specific intent to avoid criminal prosecution, see, e.g., BLACK'S LAW DICTIONARY 882 (9th ed. 2009) ("specific intent" means "[t]he intent to accomplish the precise" act with which one is later charged). That purpose is what the fugitive disentitlement statute expressly requires. But we reject Claimants' attempts (see, e.g., Claimants' brief on appeal at 3, 9) to equate specific intent with sole, principal, or dominant intent.

In Collazos, the only case in which this Court has explored the requirements of § 2466, we interpreted the "in order to avoid criminal prosecution" requirement to mean simply that Collazos must have "deliberately" sought to avoid prosecution in the United States, 368 F.3d at 198. Although Collazos's home was in Colombia and her last visit to the United States had "predated her alleged criminal conduct by many years," id. at 199, we had no difficulty in concluding that the totality of the circumstances (see Part II.A. above) supported a finding that she had "made a conscious choice not to 'enter or reenter the United States' to face the criminal charges pending against her," 368 F.3d at 201. We agree with the view of the Ninth Circuit in United States v. $671,160.00 in U.S. Currency, 730 F.3d 1051 (9th Cir. 2013):

> The existence of other factors that might have also motivated [the claimant] to remain abroad, such as his Canadian citizenship and residency, does not

undermine or foreclose the district court's finding that [the claimant] made a conscious choice to not "enter or reenter the United States" in order to avoid criminal prosecution. 28 U.S.C. § 2466(a)(1)(B). [The claimant's] desire to evade criminal prosecution need not be the sole motivating factor causing him to remain abroad, to the exclusion of all others.

730 F.3d at 1056 n.2 (emphasis added).

Claimants here, in arguing that a specific-intent requirement is a sole-intent requirement, point out that the D.C. Circuit has "suggest[ed] that a court is required to find that 'the reason' the Allens left or remain outside of the jurisdiction is to avoid prosecution" (Claimants' brief on appeal at 37 (quoting $6,976,934.65, Plus Interest, 554 F.3d at 132 (emphasis in D.C. Circuit opinion))). This contention rests entirely on the word "the" before "reason." While the emphasized definite article is suggestive, the D.C. Circuit's opinion did not elaborate or otherwise indicate that the avoidance of prosecution must be shown to be the claimant's sole reason for remaining outside of the United States.

The D.C. Circuit in $6,976,934.65, Plus Interest began by discussing whether the claimant's majority stockholder Scott--who had left the United States in 1992, long before the issuance of warrants for his arrest in 1998 and 2005--had notice of the most recent warrant (which had remained sealed until 2006). See 554 F.3d at 126, 128-30, 132. The Court stated that "the government has not yet shown that Scott had notice of the 2005 warrant. Without notice of that warrant or the attendant criminal proceedings, it is difficult to say that Scott's purpose for remaining outside the country was to avoid criminal prosecution in the D.C. court." Id. at 133.

The Court also questioned whether the government's evidence as to intent--which consisted solely of statements made by Scott to a reporter in 2001, see id. at 132--indeed indicated any goal of avoiding criminal prosecution in 2006, see id. at 126, 131-33. The Court noted that Scott's

statements could have meant that he "did not wish to reenter the United States regardless of any pending criminal charges." Id. at 132 (emphasis added). Thus, the government had not shown that Scott, in remaining outside of the United States in and after 2006, had any intent to avoid criminal prosecution. We are reluctant to impute to the D.C. Circuit a ruling that the government was also required to show that avoidance of prosecution was his sole intent.

To the extent that the D.C. Circuit's opinion in $6,976,934.65, Plus Interest was intended to mean that when a claimant declines to enter or reenter the United States the government is required to prove that avoidance of criminal prosecution is his sole purpose, we respectfully disagree. It is commonplace that the law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the actor's sole, or even primary, purpose. For example, certain crimes such as bribery, tax evasion, and conspiracy are considered specific-intent crimes. See, e.g., United States v. Sun-Diamond Growers of California, 526 U.S. 398, 404-05 (1999) (bribery); Cheek v. United States, 498 U.S. 192, 194 (1991) (tax evasion); Anderson v. United States, 417 U.S. 211, 223 (1974) (conspiracy). It is well established that a defendant accused of such a crime may properly be convicted if his intent to commit the crime was any of his objectives. See, e.g., id. at 226 ("A single conspiracy may have several purposes, but if one of them--whether primary or secondary-- be the violation of a federal law, the conspiracy is unlawful under federal law." (emphasis added)); Ingram v. United States, 360 U.S. 672, 679-80 (1959) ("A conspiracy, to be sure, may have multiple objectives, . . . and if one of its objectives, even a minor one, be the evasion of federal taxes, the offense is made out . . . ." (emphasis added)); Spies v. United States, 317 U.S. 492, 499 (1943) ("If the tax-evasion motive plays any part in [the defendant's] conduct the offense may be made out even though the conduct may also serve other purposes . . . ." (emphasis added)); United States v. Klausner,

-27-

80 F.3d 55, 63 (2d Cir. 1996) ("if a tax evasion motive plays any part in certain conduct, an affirmative willful attempt to evade taxes may be inferred from that conduct" (internal quotation marks omitted) (emphases added)); United States v. Biaggi, 909 F.2d 662, 683 (2d Cir. 1990) (A "payment may be found to constitute a bribe and an extortion where it is sought and paid for both lawful and unlawful purposes. . . . A valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability." (emphasis added)), cert. denied, 499 U.S. 904 (1991); United States v. Coyne, 4 F.3d 100, 113 (2d Cir. 1993) (finding that a jury instruction in accordance with the principle stated in Biaggi "was entirely appropriate in light of Coyne's argument that he was motivated by friendship"), cert. denied, 510 U.S. 1095 (1994).

Further, when Congress has meant to impose a sole-intent limitation, it has done so expressly. See, e.g., 18 U.S.C. § 227(a) (prohibiting certain Legislative- or Executive-Branch officials from taking or influencing official acts with respect to employment decisions of a private entity "with the intent to influence[] solely on the basis of partisan political affiliation" (emphasis added)); 18 U.S.C. § 1512(e) (allowing a defendant charged with witness tampering to prevail if he proves that his acts "consisted solely of lawful conduct and that [his] sole intention was to encourage, induce, or cause the other person to testify truthfully" (emphases added)); 10 U.S.C. § 2805(a)(2) (authorizing certain military construction projects if they are "intended solely to correct a deficiency that is life-threatening, health-threatening, or safety-threatening" (emphasis added)).

The fugitive disentitlement statute does not contain a sole-intent limitation, and we decline to engraft one. As Congress sought to bar the "unseemly spectacle" of allowing an accused to absent himself deliberately in order to avoid prosecution in the United States while using United States courts to retrieve the proceeds of his crime, Collazos, 368 F.3d at 200, it would defy logic to

-28-

infer that Congress sub silentio intended to allow the fugitive to create such an abomination by the simple expedient of claiming some additional reason for not returning.

We conclude that the district court could properly find that the Allens had the intent specified in the fugitive disentitlement statute if any of their motivations for declining to reenter the United States was avoidance of criminal prosecution.

E.  Sufficiency of the Evidence as to the Allens' Intent

Finally, we are unpersuaded by Claimants' contention that the evidence was insufficient to support the finding of the district court that the Allens, in declining to reenter the United States, had an intent to avoid criminal prosecution.  Findings of fact made by a court are not to be reversed on appeal unless they are clearly erroneous.  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).  "[F]actual findings by the district court will not be upset unless we are 'left with the definite and firm conviction that a mistake has been committed.'"  FDIC v. Providence College, 115 F.3d 136, 140 (2d Cir. 1997) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).  The district court here found the circumstantial evidence strong (see Tr. 8), and in light of the totality of the circumstances, we see no clear error in the district court's finding.

To begin with, the record is clear that Claimants' attorneys, in the months following the indictment of Claimants, made attempts to secure a promise from the government that if the Allens returned to the United States the government would not oppose their release on bail.  The district court was easily entitled to view those requests, evincing the Allens' desire to face prosecution only on their

-29-

own terms, as a hallmark indicator that at least one reason the Allens declined to return in the absence of an opportunity for bail was to avoid prosecution.

Although Claimants argue that the Allens advanced other reasons for declining to reenter the United States, the district court, in making findings under the statute, was not required to accept the Allens' explanations as true; and indeed, in assessing all of the circumstances, the court was entitled to take into account that several of their assertions could properly be viewed as false or misleading. First, as Claimants' attorney stated at oral argument in the district court, "[i]t is [the Allens'] testimony through their declarations that they did not know that th[e government's] investigation was focused on them in particular at the time they left." (Tr. 7; see also id. at 9 ("They received no evidence, no indication when they left that they were in fact a target of the investigation.").) In fact, however, the very first grand jury subpoenas, served on Claimants in December 2010, requested information about "Padma Allen," "Reddy Allen," and "Technodyne LLC," not just about others connected with the CityTime project. And in her January 2011 meeting with government prosecutors, Padma was asked questions about Technodyne's work on CityTime (which she refused to answer). These facts belied the Allens' representations that they left the United States in February and March of 2011 with no idea that the focus of the government's investigation included them. The court was entitled to consider the questionable nature of their representations as to their mental state when they left in assessing the veracity of their representations as to their reasons for not returning.

Second, Padma, in initially describing the January 2011 meeting with prosecutors, stated that she had "replied to all of their questions" (First Padma Decl. ¶ 13). To the extent that "replied to all" (emphasis added) was intended to convey the impression that she had answered all of

the prosecutors' questions, it was false and misleading. After the government pointed out that Padma "did not answer questions about Technodyne's work on the CityTime Project" (Master Decl. ¶ 4; Government Reply Memorandum at 4), Padma admitted that, on the advice of her attorney, she had declined to "answer[] some of the questions" (Second Padma Decl. ¶ 6). Thus, although the Allens suggested that it could not be inferred that they sought to avoid prosecution given that they had been fully cooperative, their factual premise of full cooperation was shown to be false.

The court was also entitled to discredit the Allens' assertions that, in leaving and remaining outside of the United States, they had taken no steps to convert or shelter any of their assets. Padma, following Claimants' receipt of the first set of grand jury subpoenas, had caused Technodyne to begin transferring more than $10.4 million to accounts of McCreade in India (see Hibshoosh Declaration ¶¶ 3-4). Although Padma said those transfers were in payment of legitimate debts of Technodyne, and Claimants' attorney argued that the Allens had "provided an innocuous rationale" for the money transfers (Hearing Tr. 9), Claimants did not deny that the receiving accounts were in the name of Padma's mother.

Further, the district court was entitled to be skeptical of the Allens' assertions that their remaining in India was based in part on a desire not to interfere with the education of their children. The Allens had pulled their children out of school in the United States on May 29, 2011, "just a couple of weeks before their final exams"; in so doing, they cost the children credit for the entire second semester of that school year. (Allens' Decls. ¶ 23.) The additional suggestion that the Allens needed to remain in India because the children would be emotionally disturbed by a return to the United States (see id.) is belied by the Allens' acknowledgement that the children had "not been able to cope with the sudden displacement [from the United States] and hence could not adjust in Indian

schools, resulting in them receiving poor grades" (id. (emphasis added)).

Finally, the court was entitled to view the attempts to negotiate the Allens' release on bail at the two meetings of their attorneys with the prosecutors as independent of an additional request, made at the initial meeting, that the government release some of the seized assets. To the extent that their requests for bail were independent, they provided an additional basis for discrediting the Allens' representations that they declined to return to the United States due to financial concerns, for the making of bail requests indicated both that the Allens had the resources to support themselves and their family in the United States and that they could afford to post what would doubtless be a sizeable bond.

In sum, the totality of the circumstances shown in the record easily supported the district court's finding that the Allens declined to return to the United States at least in part in order to avoid criminal prosecution.

## CONCLUSION

We have considered all of Claimants' appellate challenges and have found them to be without merit. For the reasons stated above, we see no abuse of discretion in the district court's order of disentitlement. The judgments are affirmed.