**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1360**

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

> v.

FINN BATATO; BRAM VAN DER KOLK; JULIUS BENCKO; MATHIAS ORTMANN; SVEN ECHTERNACH; KIM DOTCOM; MEGAUPLOAD LIMITED; MEGAPAY LIMITED; VESTOR LIMITED; MEGAMEDIA LIMITED; MEGASTUFF LIMITED; MONA DOTCOM,

> Claimants – Appellants,

> and

ALL ASSETS LISTED IN ATTACHMENT A, AND ALL INTEREST, BENEFITS, AND ASSETS TRACEABLE THERETO, in Rem,

> Defendant.

------------------------

CATO INSTITUTE; INSTITUTE FOR JUSTICE; NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

> Amici Supporting Appellants.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, District Judge. (1:14-cv-00969-LO-MSN)

Argued: March 22, 2016          Decided: August 12, 2016

Before GREGORY, Chief Judge, and DUNCAN and FLOYD, Circuit Judges.

---

Affirmed by published opinion. Chief Judge Gregory wrote the majority opinion, in which Judge Duncan joined. Judge Floyd wrote a dissenting opinion.

---

**ARGUED**: Michael S. Elkin, WINSTON & STRAWN LLP, New York, New York, for Appellants. Jay V. Prabhu, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF**: Craig C. Reilly, Alexandria, Virginia, for Appellants; Robb C. Adkins, San Francisco, California, Steffen N. Johnson, Christopher E. Mills, WINSTON & STRAWN LLP, Washington, D.C., for Appellant Megaupload Limited; David B. Smith, SMITH & ZIMMERMAN, PLLC, Alexandria, Virginia, for Appellants Julius Bencko and Sven Echternach; Ira P. Rothken, Jared R. Smith, ROTHKEN LAW FIRM, Novato, California, William A. Burck, Derek L. Shaffer, Stephen M. Hauss, QUINN EMANUEL URQUHART & SULLIVAN, Washington, D.C., for Appellants Kim Dotcom and Megaupload Limited. Dana J. Boente, United States Attorney, G. Wingate Grant, Assistant United States Attorney, Karen L. Taylor, Assistant United States Attorney, Jasmine H. Yoon, Assistant United States Attorney, Allison B. Ickovic, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Ryan K. Dickey, Brian L. Levine, Senior Counsel, Computer Crime & Intellectual Property Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Darpana Sheth, INSTITUTE FOR JUSTICE, Arlington, Virginia, Thomas K. Maher, NORTH CAROLINA OFFICE OF INDIGENT DEFENSE SERVICES, Durham, North Carolina, Ilya Shapiro, CATO INSTITUTE, Washington, D.C., for Amici Cato Institute, Institute for Justice, and National Association of Criminal Defense Lawyers.

---

GREGORY, Chief Judge:

The claimants in this case appeal from the district court's entry of default judgment for the government in a civil forfeiture action against funds deposited in the claimants' names in banks in New Zealand and Hong Kong. Default judgment was entered after the government successfully moved to disentitle the claimants from defending their claims to the defendant property under the federal fugitive disentitlement statute, 28 U.S.C. § 2466. The claimants appeal the judgment on several grounds, most prominent among them that the district court lacked jurisdiction over the defendant property because it resides in foreign countries, that fugitive disentitlement violates constitutional due process, and that disentitlement in this case was improper because the claimants are not fugitives from the law. Finding these arguments unpersuasive, we affirm the district court.

I.

On January 5, 2012, a grand jury returned an indictment against many of the claimants in this action, charging them with criminal copyright infringement and money laundering "with estimated harm to copyright holders well in excess of $500,000,000 and reported income in excess of $175,000,000." Gov't Br. 4. The claimants' alleged copyright infringement

3

scheme, dubbed the "Mega Conspiracy," used public websites to facilitate the illegal reproduction and distribution of copyrighted movies, software, television programs, and music. The government estimates that the alleged criminal conduct has caused billions of dollars in harm to the copyright holders.

Following the indictment, the district court issued restraining orders for assets in New Zealand and Hong Kong where most of the remaining identified proceeds resided. The High Court in Hong Kong responded almost immediately by issuing a restraining order against approximately $60 million in assets, while New Zealand first arrested several of the now-claimants, released them on bail, and then several months later, in April, registered restraining orders on $15 million in assets. New Zealand also scheduled extradition hearings for August 2012, but these hearings have been continued at least eight times at the claimants' request.

The New Zealand restraining orders could only remain registered for two years, after which they could be extended for up to one year. Recognizing that the restraints would run out on April 18, 2014, or if extended on April 18, 2015, the United States filed this civil forfeiture action against forty-eight assets restrained pursuant to the criminal indictment in the district court on July 29, 2014. Although restraining orders froze the assets in the lead up to this action, the New Zealand

4

courts have routinely released funds to claimants for living and legal expenses. Some of these have been very substantial, including millions in legal fees for Kim Dotcom, and $170,000 per month for living expenses for the same claimant.

Most of the claimants in this case filed their claims together on August 28, and Mona Dotcom filed a spousal claim on September 1, 2014. The claimants also filed a joint waiver of notice. The government subsequently moved to strike all the claimants' claims pursuant to 28 U.S.C. § 2466, the federal fugitive disentitlement statute. On February 27, 2015, the district court granted the motion to strike, having allowed claimants to appear and present arguments on the motion but not on the merits of the case. The government then moved for default judgment, which the district court granted on March 25, 2015, issuing forfeiture orders for the assets in New Zealand and Hong Kong. United States v. All Assets Listed in Attachment A, 89 F. Supp. 3d 813 (E.D. Va. 2015).

Claimants timely noted this appeal.


II.

The claimants' first challenge to the district court judgment contests that court's in rem jurisdiction over assets in foreign countries. The claimants make essentially several arguments which we will address in turn: first, the statute

5

cited by the district court as establishing its jurisdiction speaks to venue rather than jurisdiction; second, that if that statute is jurisdictional, the case must still be justiciable, meaning the district court must have sufficient control over the res to render a binding opinion effecting title; and finally, that jurisdiction was improper because the district court did not have sufficient minimum contacts with the defendant property.

A.

The district court asserted <u>in rem</u> jurisdiction pursuant to 28 U.S.C. § 1355(b)(2).[1]   There is a potential split in the

---

[1] For convenience, the relevant portions of § 1355 are reproduced here:

(a) The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress, except matters within the jurisdiction of the Court of International Trade under section 1582 of this title.

(b) (1) A forfeiture action or proceeding may be brought in--

(A) the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred, or

(B) any other district where venue for the forfeiture action or proceeding is specifically provided for in section 1395 of this title or any other statute.

(Continued)

6

circuit courts regarding how to interpret subsection (b): the Second Circuit has held that it merely makes _venue_ proper in certain courts, while the Third, Ninth, and D.C. Circuits have held that it establishes _jurisdiction_ in those courts.[2] The district court adopted the majority approach, and we affirm that decision.

---

(2) Whenever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia.

\* \* \*

(d) Any court with jurisdiction over a forfeiture action pursuant to subsection (b) may issue and cause to be served in any other district such process as may be required to bring before the court the property that is the subject of the forfeiture action.

[2] There is only a "potential" split because the Second Circuit may have reversed itself following its decision in _United States v. All Funds on Deposit in Any Accounts Maintained in Names of Meza or De Castro_, 63 F.3d 148 (2d Cir. 1995). As the district court noted, a year after _Meza_ the Second Circuit described § 1355(b) as an amendment "to provide district courts with _in rem_ jurisdiction over a res located in a foreign country." _United States v. Certain Funds Contained in Account Numbers 600-306211-006, 600-306211-011 & 600-306211-014 Located at Hong Kong & Shanghai Banking Corp._, 96 F.3d 20, 22 (2d Cir. 1996). This language appears to at least abrogate _Meza_ in the Second Circuit. If so, adopting the reasoning in _Meza_ here would actually _create_ a split between this Court and the Second, Third, Ninth, and D.C. Circuits.

7

"Under the traditional paradigm, 'the court must have actual or constructive control over the res when an in rem forfeiture suit is initiated.'" United States v. Approximately $1.67 Million, 513 F.3d 991, 996 (9th Cir. 2008) (quoting United States v. James Daniel Good Real Prop., 510 U.S. 43, 58 (1993)). The question is whether § 1355—particularly the 1992 amendments which added subsections (b) and (d), authorizing district courts to issue process against property outside their districts— effectively dispenses with this traditional requirement. In the only circuit opinion to so hold, the Second Circuit said it does not do so with respect to property outside the United States. United States v. All Funds on Deposit in Any Accounts Maintained in Names of Meza or De Castro, 63 F.3d 148, 152 (2d Cir. 1995). The Meza court read § 1355(b) to make venue proper in cases involving foreign property where the district court had control over that property. Id. at 151 ("Section 1355(b) addresses venue in forfeiture actions . . . ."). While subsection (d) establishes legal control over property located outside the court's jurisdiction but inside the United States, the Meza court held that a showing of control was still required for property outside the United States. Id. at 152.

This interpretation fails a closer textual analysis and runs contrary to the legislative history of the 1992 amendments. By its own terms, § 1355(d) only applies to "[a]ny court with

8

<u>jurisdiction</u> over a forfeiture action <u>pursuant</u> to subsection (b)." § 1355(d) (emphasis added). The plain meaning of § 1355(d), therefore, renders the <u>Meza</u> court's finding that "[s]ection 1355(b) addresses venue" impossible—courts may acquire jurisdiction by operation of the provision. Although it would be clearer still for § 1355(b) to explicitly state its own jurisdictional nature, rather than merely saying that a "forfeiture action or proceeding may be brought in" those district courts it describes, the plain meaning of that language in the context of the entire statute is unmistakable.

The <u>Meza</u> court's interpretation, urged by the claimants here, also runs contrary to the legislative history of the 1992 amendments. When the amendments were introduced in the Money Laundering Improvements Act, Senator D'Amato included an explanatory statement indicating that subsection (b) was intended to provide the federal district courts with jurisdiction over foreign property:

> Subsection (b)(2) addresses a problem that arises whenever property subject to forfeiture under the laws of the United States is located in a foreign country. As mentioned, under current law, it is probably no longer necessary to base in rem jurisdiction on the location of the property if there have been sufficient contacts with the district in which the suit is filed. <u>See</u> <u>United States v. $10,000 in U.S. Currency</u>[, 860 F.2d 1511 (9th Cir. 1988)]. No statute, however, says this, and the issue has to be repeatedly litigated whenever a foreign government is willing to give effect to a forfeiture order issued by a United States court and turn over seized property to the United

9

> States if only the United States is able to obtain such an order.
>
> Subsection (b)(2) resolves this problem by providing for jurisdiction over such property in the United States District Court for the District of Columbia, in the district court for the district in which any of the acts giving rise to the forfeiture occurred, or in any other district where venue would be appropriate under a venue-for-forfeiture statute.

137 Cong. Rec. S16640-01 (Nov. 13, 1992) (statement of Sen. D'Amato). The Meza court acknowledged, but did not analyze, this evidence of legislative history, which clearly weighs in favor of affirming the district court's interpretation of § 1355.

Because the plain meaning of the statutory text and the legislative history both support finding that 28 U.S.C. § 1355(b) is jurisdictional, we affirm the district court's holding to that effect. The district court was also correct to find that jurisdiction would lie if any of the acts resulting in the forfeiture action occurred within its jurisdiction. The court noted that the civil complaint and the related criminal indictment allege that there was a conspiracy between the indicted parties and that they used "over 525 servers located within the Eastern District of Virginia." All Assets Listed in Attachment A, 89 F. Supp. 3d at 823 (footnote omitted). The government furthermore contends, and the claimants do not deny, that the cost of using those servers ran into the "tens of

10

millions of dollars over a period of years." Gov't Br. 18. This easily satisfies the relatively low standard set forth in § 1355, and so we affirm the district court's finding that it had jurisdiction under the statute.

B.

The claimants next argue that the district court's forfeiture order amounts to a nonbinding advisory opinion because foreign sovereigns must honor that order for it to have any effect on title to the res. The argument rests on two overlapping but distinguishable premises. The first is that principles of admiralty law which usually predicate in rem jurisdiction on the court's control of the res apply equally to this case. This argument relies principally on our decisions in R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943 (4th Cir. 1999) [hereinafter Titanic I], and R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel, 435 F.3d 521 (4th Cir. 2006) [hereinafter Titanic II]. The claimants' second premise is that Article III of the U.S. Constitution will not tolerate courts asserting in rem jurisdiction without "exclusive custody and control" of the res because such courts cannot "adjudicate rights . . . binding against the world," see Titanic I, 171 F.3d at 964, but are instead limited to rendering advisory opinions "subject to revision" by other governments, see Nashville, C. & St. L. Ry v. Wallace, 288 U.S. 249, 261-62 (1933).

11

This is essentially the same "lack-of-control" attack claimants launched against § 1355 as just discussed, but they attempt to reframe the argument as addressing more fundamental issues.

i.

The claimants' first argument fails because it confuses principles of admiralty law for principles of constitutional law.  Both Titanic I and Titanic II describe jurisdictional principles governing admiralty courts and the law of the sea. The two crucial distinctions between these cases and the one before us are (1) that the Titanic cases based jurisdiction on the common law of admiralty whereas this case relies on § 1355, and (2) the Titanic cases involved a salvage and so no court could assert jurisdiction through exclusive control of the res, but here the res resides in two sovereign nations that are cooperating with federal authorities from this country regarding the assets in question.

The claimants fail to acknowledge the most glaring problem with their reliance on Titanic I and Titanic II:  the cases speak explicitly in terms of the jurisdictional limits of admiralty courts pursuant to "the common law of the seas." Titanic I, 171 F.3d at 960-61 ("Thus, when we say today that a case in admiralty is governed by the general maritime law, we speak through our own national sovereignty and thereby recognize

12

and acquiesce in the time-honored principles of the common law of the seas.").

"Maritime law . . . provides an established network of rules and distinctions that are practically suited to the necessities of the sea," United States v. W.M. Webb, Inc., 397 U.S. 179, 191 (1970), and as one of our sister circuits has noted, "The general statute governing forfeiture actions states that '[u]nless otherwise provided by Act of Congress . . . in cases of seizures on land the forfeiture may be enforced by a proceeding in libel which shall conform as near as may be to proceedings in admiralty,'" United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain, 295 F.3d 23, 26 (D.C. Cir. 2002) (quoting 28 U.S.C. § 2461(b)). But of course, there is another statute—§ 1355—guiding the action here, and we have just described how that statute confers jurisdiction on the district court. Thus, absent the amendments to § 1355, there might be "little doubt that traditional rules of in rem jurisdiction developed under admiralty law would apply," id., but as things stand there can be no doubt that § 1355 must prevail. As such, the cooperation (or lack thereof) of foreign nations in enforcing any of the district court's orders "determines only the effectiveness of the forfeiture orders of the district

courts, not their jurisdiction to issue those orders." Id. at 27.

Finally, on this point, we note that admiralty cases involving salvages on the high seas (like the Titanic cases) necessarily involve difficult questions of previously owned property lost in shared international waters where no nation has sovereignty. Our opinion in Titanic I was crafted "to ensure that the conclusion that no nation has sovereignty through the assertion of exclusive judicial action over international waters does not leave the high seas without enforceable law." 171 F.3d at 968. These questions are not at issue here and there is no need to plumb their depths as the claimants invite us to do. Instead, we turn to the question of justiciability which involves related issues of control.

ii.

The claimants here argue that the district court is without jurisdiction because, without control of the res, it can only advise the courts of New Zealand and Hong Kong rather than disposing of the issues presented. It is among "the oldest and most consistent thread[s] in the federal law of justiciability . . . that the federal courts will not give advisory opinions," Flast v. Cohen, 392 U.S. 83, 96 (1968) (quotations omitted), and there are numerous cases holding that judicial decisions may not be rendered if they would be subject to revision by another

14

branch of government, e.g., Chicago & S. Airlines Co., 333 U.S. 103, 113-14 (1948). But this principle addresses itself to maintaining the separation of powers between the branches of our own government, not to concerns of sovereignty or international comity. See Courtney J. Linn, International Asset Forfeiture and the Constitution: The Limits of Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C. § 1355(b)(2), 31 Am. J. Crim. L. 251, 297-98 (2004) (collecting numerous cases, all addressing only revision by other branches of the United States government).

For a court to hear a case "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) (quotations omitted). We need to not wade into the potentially thorny issues raised by claimants because this case meets the test articulated in Lujan—the foreign sovereigns have cooperatively detained the res by issuing orders restraining the defendant property pursuant to this litigation. By showing that the res was placed in custody in New Zealand and Hong Kong based on the district court's order, JA 468-69, the government has demonstrated that it is likely, rather than speculative, that these courts will honor a forfeiture order from the United States. While the claimants repeatedly point to foreign court

15

releases of restrained funds, these simply do not prove that an order of forfeiture is unlikely to be honored.

The district court, also in reliance on the cooperation of Hong Kong and New Zealand, concluded its opinion would not be advisory and that the court is capable of redressing the issue. We affirm that decision.

C.

The claimants next seek to challenge the district court's assertion of jurisdiction under the Due Process Clause of the Fifth Amendment. They argue that, regardless of any statute passed by Congress, a federal court cannot assert jurisdiction unless it is established that the defendant meets the "minimum contacts" test articulated by International Shoe v. State of Washington, Office of Unemployment Compensation & Placement, 326 U.S. 310 (1945) and its progeny, citing Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 224 (4th Cir. 2002). The district court held that the statute's requirement that this kind of in rem action be brought in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred," § 1355(b)(1)(A), "serve[d] much the same function as the minimum contacts test" and therefore analyzed only that question. J.A. 1963 n.10. While we disagree with the district court's analytical approach, its conclusion that the facts supporting statutory jurisdiction also establish

16

sufficient contacts to meet due process, in this case, is affirmed.

While Congress has substantial power to set the jurisdiction of the federal courts, the Due Process Clause limits that power. The exact contours of that limitation are not entirely clear. In Shaffer v. Heitner, 433 U.S. 186 (1977), the Supreme Court held "that all assertions of state-court jurisdiction must be evaluated according to the standards set forth in International Shoe and its progeny." 433 U.S. at 212. The Court's insight was that "the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States on which the rules of Pennoyer [v. Neff, 95 U.S. 714 (1878)] rest, [had become] the central concern of the inquiry into personal jurisdiction," and that similar concerns should govern in rem jurisdiction. Id. at 204. The Court rejected the narrow theory that in rem actions were strictly actions against property, concluding that "in order to justify an exercise of jurisdiction in rem, the basis for jurisdiction must be sufficient to justify exercising jurisdiction over the interests of persons in a thing." Id. at 207 (quotation marks omitted). Thus the appeal of applying the minimum contacts test in in rem cases.

The Court's decision in Shaffer, however, emerged from a case that might be viewed as the inverse of what § 1355(b)

17

contemplates: the property at issue was stock in a Delaware corporation that was, by virtue of state law, legally sited in the state of Delaware, while the owners of that stock had no other ties to the state. The Court determined that, despite the property being legally located in the state, the owners of that stock had insufficient contacts with Delaware for courts there to invoke quasi in rem jurisdiction over the underlying shareholder's derivative suit. Id. at 213. But § 1355(b) contemplates something completely different—a federal district court asserting in rem jurisdiction over property (which, in contrast to Shaffer, is central to the forfeiture action) located outside the forum.

Given that Shaffer provides only limited guidance as to how to proceed in this case, we assume without deciding that a traditional, state-based minimum contacts approach is appropriate in this case,[3] as posited by the claimants. Applying

---

[3] "Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State. This is consistent with the premises and unique genius of our Constitution." J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011). Given this principle, and based on the interplay between Federal Rules of Civil Procedure 4(k)(1)(C) and 4(k)(2), it has been held elsewhere that statutes expanding a district court's jurisdiction to the entire country may transform the minimum contacts test into a "national contacts" test. See Graduate Mgmt. Admission Council v. Raju, 241 F. Supp. 2d 589, 597 (E.D. Va. 2003) ("Rule 4(k)(2) was added in 1993 to deal with a gap in federal personal jurisdiction law in (Continued)

that test we find that the contacts are sufficient and due process is not violated by the district court's assertion of jurisdiction.

As in other cases we have decided in which websites and web transactions have been the asserted basis for jurisdiction, we will analyze the minimum contacts question by applying the factors commonly used for determining specific personal jurisdiction: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" <u>Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.</u>, 334 F.3d 390, 397 (4th Cir. 2003).

---

situations where a defendant does not reside in the United States, and lacks contacts with a single state sufficient to justify personal jurisdiction, but has enough contacts with the United States as a whole to satisfy the due process requirements."); <u>see also</u> <u>Sec. Inv'r Prot. Corp. v. Vigman</u>, 764 F.2d 1309, 1315 (9th Cir. 1985); <u>F.T.C. v. Jim Walter Corp.</u>, 651 F.2d 251, 256 (5th Cir. 1981); <u>cf.</u> <u>ESAB Grp., Inc. v. Zurich Ins. PLC</u>, 685 F.3d 376, 391 n.8 (4th Cir. 2012) (declining to assess nationwide contacts pursuant to Rule 4(k)(2) because state long-arm statute authorized jurisdiction). It may therefore be possible for such a test to substitute in <u>in rem</u> actions like this one. Finding no need to rely on this test, however, we decline to express an opinion on the matter.

19

As already mentioned, both the forfeiture complaint and the criminal indictment allege that 525 servers located within the Eastern District of Virginia were used in furtherance of the Mega Conspiracy. All Assets Listed in Attachment A, 89 F. Supp. 3d at 823. The government further alleges, and the claimants do not dispute, that these servers were "operated and closely controlled" by the claimants "at a cost of tens of millions of dollars over a period of years." Gov't Br. 18. We find that such contacts are sufficient to show the claimants "purposefully availed [themselves] of the privilege of conducting activities in the state." See Carefirst, 334 F.3d at 397.

The claimants argue, however, that "this Court has repeatedly dismissed 'as "de minimis" the level of contact created by the connection between an out-of-state defendant and a web server located within a forum.'" Appellants' Br. 17-18 (quoting Carefirst, 334 F.3d at 402). Besides not being a binding rule of general applicability, the particular facts of this case warrant a different outcome than otherwise might be true. The quote they rely on is an unfortunate paraphrasing in our Carefirst opinion of a discussion contained in a footnote of another case, Christian Science Board of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209 (4th Cir. 2001). In Nolan we went to some lengths to note that we were not deciding the effect an in-forum server might have on

20

jurisdiction as the case did not present those facts—the server involved was operated in California, not the forum state of North Carolina. Id. at 217 n.9. The Carefirst opinion therefore fails to adequately capture the impact of Nolan. Carefirst also does not purport to state a rule of general application, nor could it given that the reference is contained in dicta—Carefirst, like Nolan, did not involve an in-forum web server and so the Court had no opportunity to address the effect such a server might have on the jurisdictional question. Carefirst, 334 F.3d at 402 ("NetImpact merely facilitated the purchase of CPC's domain names and rented CPC space on its servers—which in fact were located not in [the forum state of] Maryland, but in Massachusetts.").

More to the point, this case does not involve a single server that happened to reside in the forum state. It involves hundreds of servers, closely controlled by the claimants, representing an investment of tens of millions of dollars. Moreover, whereas Carefirst and Nolan involved conspiracies in which a website was used to fraudulently solicit contributions from individuals, the type of conspiracy alleged in this case makes the servers a much more integral aspect of the crime. The alleged Mega Conspiracy was a file-sharing scheme in which copyrighted files were illegally transferred to users around the world through the servers located in Ashburn, Virginia. The

21

volume of data involved, while not disclosed in briefs to this Court, would necessarily have been orders of magnitude greater than that involved in Carefirst and Nolan. In those cases the defendants were alleged to be using the Internet to commit a traditional sort of fraud, and we decided the more important activity was "creating and updating the . . . website." See Nolan, 259 F.3d at 217 n.9. Here, the servers themselves held and allowed the transfer of the copyrighted material—they were the central conduit by which the conspiracy was conducted. The location of a substantial number of the servers in Virginia is clearly enough to demonstrate purposeful availment.

The second factor, whether the plaintiffs' claims arise out of those activities directed at the state, is easily met: the forfeiture action before this Court arises from the alleged illegal transfer of files conducted using the servers located in Virginia.

The third factor, constitutional reasonableness, is also met. To determine constitutional reasonableness, we look at "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger

King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)) (internal quotation marks omitted). This factor is largely used to police for exploitation of jurisdictional rules and ensure that defending a suit is not "so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent." Id. at 478 (quoting The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 18 (1972)) (internal quotation marks omitted). The claimants do not argue that Virginia is any less convenient than any other available forum, and we perceive no evidence that the government filed where it did for any untoward purpose.

## III.

The district court ordered the claimants disentitled from defending claims to the defendant property pursuant to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 28 U.S.C. § 2466. The effect of the order was to prevent the claimants from using the U.S. courts to defend their claims to the property. The claimants argue that this application of 28 U.S.C. § 2466 violates the Due Process Clause of the Fifth Amendment by stripping them of their right to be heard. The claimants present arguments closely tracking those rejected by the Second Circuit in Collazos v. United States, 368 F.3d 190, 202-05 (2d

23

Cir. 2004). The district court effectively adopted the reasoning of that case, holding that the claimants had waived the due process rights they claimed were violated by operation of § 2466. All Assets Listed in Attachment A, 89 F. Supp. 3d at 832 n.21. We now affirm the district court's decision.

A.

Fugitive disentitlement began as a judicial doctrine allowing appellate courts to dismiss appeals from criminal fugitives who failed to surrender to authorities, holding that such failure "disentitles the defendant to call upon the resources of the Court for determination of his claims." See Molinaro v. New Jersey, 396 U.S. 365, 365-66 (1970). Prior to 1996, the courts of appeals were split on the question of whether fugitive disentitlement would also "allow a court in a civil forfeiture suit to enter judgment against a claimant because he is a fugitive from, or otherwise is resisting, a related criminal prosecution." Degen v. United States, 517 U.S. 820, 823 (1996) (citing as examples United States v. Eng, 951 F.2d 461 (2d Cir. 1991) (extending fugitive disentitlement to civil forfeiture); United States v. $40,877.59 in U.S. Currency, 32 F.3d 1151 (7th Cir. 1994) (declining to extend fugitive disentitlement to civil forfeiture); and United States v. $83,320 in U.S. Currency, 682 F.2d 573 (6th Cir. 1982) (same)).

24

In 1996, the U.S. Supreme Court struck a federal district court's use of disentitlement to strike a civil forfeiture claimant's defense on the grounds that he was a fugitive evading related criminal charges. Id. at 828. The Court was clearly conflicted over the interests presented by the disentitled party, the government seeking forfeiture, and the district court itself. It noted that "[t]he need to redress the indignity visited upon the District Court by Degen's absence from the criminal proceeding, and the need to deter flight from criminal prosecution by Degen and others" were both "substantial" interests. Id. It also "acknowledge[d] disquiet at the spectacle of a criminal defendant reposing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored." Id. On the other hand, the Court was even more concerned that "too free a recourse to rules" such as disentitlement that "foreclose[e] consideration of claims on the merits" might "disserve the dignitary purposes for which [they are] invoked," eroding respect for the courts. Id. It concluded that "[a] court's inherent power is limited by the necessity giving rise to its exercise" and that "[t]here was no necessity to justify the rule of disentitlement in [that] case." Id. at 829.

25

In the course of that opinion, the Supreme Court acknowledged that the answer might be different if civil disentitlement were authorized by statute. Id. at 828. The Court expressly left open the question of such a statute's constitutionality. Id. It was against this backdrop that CAFRA was enacted by Congress, and this appeal presents this Court with its first opportunity to pass upon that open question.

B.

The claimants argue that the district court was not constitutionally authorized to disentitle them from defending their property claims against the government's forfeiture action, regardless of any statute passed by Congress. They argue that "[t]he fundamental requirement of due process is the opportunity to be heard," Doolin Sec. Sav. Bank, FSB v. FDIC, 53 F.3d 1395, 1402 (4th Cir. 1995) (quotations omitted), that disentitlement violates this precept, and that Degen confirms their position.

To begin, much of Degen's reasoning declaring judicial disentitlement unconstitutional centered on balance-of-powers concerns eliminated by the congressional authorization manifest in § 2466. The Degen Court noted that "[p]rinciples of deference counsel restraint in resorting to inherent power," 517 U.S. at 820 (emphasis added), and that "[t]he extent of [inherent judicial] powers must be delimited with care, for

26

there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority," id. at 823. It went on to expressly convey that were Congress or the Executive involved, the analysis would differ: "In many instances the inherent powers of the courts may be controlled or overridden by statute or rule." Id. We believe this is one such instance.

But more to the point, the claimants' argument fails primarily because § 2466 does not eliminate "the opportunity to be heard." Id. (emphasis added). The guarantees of due process do not mean that "the defendant in every civil case [must] actually have a hearing on the merits." Boddie v. Connecticut, 401 U.S. 371, 378 (1971). "What the Constitution does require is an opportunity . . . granted at a meaningful time and in a meaningful manner, for a hearing appropriate to the nature of the case." Id. (internal quotations omitted); see also James Daniel Good, 510 U.S. at 48 ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property."). A party's failure to take advantage of that opportunity waives the right it secures. See Boddie, 401 U.S. at 378-79.

27

The government points out that courts regularly impose procedural requirements that will control when and how a party may be heard, including requiring that an appearance be made in court. See id. ("A State, can, for example, enter a default judgment against a defendant who, after adequate notice, fails to make a timely appearance . . . ."). As was true of the claimant in Collazos, the claimants here "could have secured a hearing on [their] forfeiture claim any time . . . simply by entering the United States." 368 F.3d at 203. They declined to do so.

While the claimants correctly respond that § 2466 is no mere procedural requirement, their argument actually underscores the justification for disentitlement pursuant to statute. Whereas entering default judgment against a party for failure to meet a nonsubstantive requirement might produce the same result as in Degen, the refusal to face criminal charges that would determine whether or not the claimants came by the property at issue illegally supports a presumption that the property was, indeed, so obtained. Id. at 203-04. The very logic of fugitive disentitlement is that refusal to face and defend against charges, particularly in criminal court where procedural rights and the presumption of innocence favor the defendant, is "but an admission of the want of merit in the asserted defense." See Hammond Packing Co. v. Arkansas, 212 U.S. 322, 351 (1909). And

28

the Supreme Court has long approved the power of the legislature to authorize dismissal on the creation of such a presumption. Id.

The distinction is made clearer by reviewing one of two nineteenth-century cases on which the claimants unsuccessfully rely, Hovey v. Elliott, 167 U.S. 409 (1897).[4]  In that case the trial court used disentitlement as a punishment:  it held the defendants in contempt for failure to deposit funds in the court registry pursuant to its order, and it punished them by striking their answer and entering default judgment against them.  Id. at 411-12.  The Supreme Court reversed, noting as axiomatic that courts must pursue and render justice rather than acting arbitrarily and becoming "instrument[s] of wrong and oppression."  Id. at 413-14.

But in Hammond Packing the Court distinguished the situation in Hovey from one where a party creates an adverse presumption against itself.  212 U.S. at 349-50.  The Court held

_____

[4] The claimants also rely on McVeigh v. United States, 78 U.S. 259 (1870), but that case is simply inapposite.  It involved the government's seizure of property from a former Confederate officer whose claim and answer were struck because, the trial court held, he was an enemy alien and could not seek relief in federal court.  78 U.S. at 261.  But "while Mr. McVeigh could not undo his past support for the Confederacy in order to obtain a hearing on his confiscation claim," Collazos, 368 F.3d at 203, claimants here have had every opportunity to come into court and be heard.

that in the latter an answer may rightly be stricken and default judgment entered because it is not an arbitrary punishment but the inevitable result of that presumption. Id. at 350-51 ("The proceeding here taken may therefore find its sanction in the undoubted right of the lawmaking power to create a presumption of fact as to the bad faith and untruth of an answer to be gotten from the suppression or failure to produce the proof ordered, when such proof concerned the rightful decision of the cause."). In such a case, "the sanction is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver." Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 706 (1982).

We make two final notes in support of our decision. First, there can be no doubt that the claimants' waiver was knowing. Section 2466 leaves the application of disentitlement to the court's discretion, see § 2466(a) (using "may" instead of "shall"), and in this case, the claimants were given a full opportunity to resist its application. Given their lengthy, and apparently expensive, intransigence with regard to the underlying controversy, it cannot be argued that they were unaware of the statute's consequences and therefore unable to waive. Cf. United States v. Eng, 951 F.2d 461, 466 (2d Cir. 1991), abrogated by Degen, 517 U.S. 820 ("The doctrine operates

30

as a waiver by a fugitive of his due process rights in related civil forfeiture proceedings.").

Second, we are not certain that Degen cast as wide a net as the claimants argue. In that decision, the Supreme Court concluded that "[t]here was no necessity to justify the rule of disentitlement in this case," 517 U.S. at 829 (emphasis added), and we have interpreted the opinion to mean only that courts acting on inherent authority "[can]not rely on the fugitive from justice doctrine to dismiss a civil forfeiture action merely 'because [the party] is a fugitive from, or otherwise is resisting, a related criminal prosecution,'" Jaffe v. Accredited Sur. & Cas. Co., 294 F.3d 584, 596 (4th Cir. 2002) (emphasis added) (quoting Degen, 517 U.S. at 823). These opinions appear to leave open the possibility that different circumstances could more readily justify disentitlement, statutory or otherwise.

In this case, the claimants readily concede that the property at issue is being spent rapidly, despite numerous orders attempting to restrain it. The government can therefore show a need, in this case, to use more extreme measures. Cf. James Daniel Good, 510 U.S. at 62 (holding that to show "exigent circumstances" sufficient to justify seizure of real property without notice or hearing the government must "show that less restrictive measures—i.e., a lis pendens, restraining order, or bond—would not suffice to protect the Government's interests in

31

preventing the sale, destruction, or continued unlawful use of the real property"). And the facts here are distinguishable from those in Degen, most notably in that the property is located outside the United States, complicating jurisdiction and the district court's ability to resolve these important issues. We have no need to re-open the debate on judicial disentitlement at this time. But these differences help demonstrate that notions of due process are not so rigid that they cannot be adapted in light of a party's clear intent to use procedural guarantees to avoid substantial justice.

As § 2466 predicates disentitlement on an allowable presumption that a criminal fugitive lacks a meritorious defense to a related civil forfeiture, we find it does not violate the Due Process Clause of the Fifth Amendment and affirm the district court's decision.


IV.

Having established the constitutionality of § 2466, we now proceed to review its application in this case. The claimants principally challenge the district court's finding that each of them is a fugitive from law as defined by the statute. We

32

address two[5] of their arguments: first, that § 2466 defines a fugitive as a person whose "sole" or "principal" reason for remaining outside the United States is to avoid criminal prosecution, and so the district court erred in adopting a lower "specific intent" standard; and second, that even if § 2466 only requires specific intent, the government has failed to prove the claimants intended to avoid the United States at all.

Finding none of their arguments persuasive, we affirm the decision of the district court.

A.

The intent standard established by § 2466 is an issue of first impression in this Court. We review questions of statutory interpretation de novo. United States v. Ide, 624 F.3d 666, 668 (4th Cir. 2010).

A person is a fugitive subject to disentitlement if he or she,

> (1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution--
>
>> (A) purposely leaves the jurisdiction of the United States;
>>
>> (B) declines to enter or reenter the United States to submit to its jurisdiction; or

---

[5] The claimants also argue that the district court abused its discretion in deciding to disentitle them, but its brief on this point merely repeats arguments made elsewhere and we see no reason to repeat ourselves in response.

33

> (C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and
>
> (2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.

§ 2466(a). The dispute here is over the meaning of "in order to avoid criminal prosecution," which the claimants argue requires a showing that the individual's sole or primary reason for being absent from the United States is evasion. The district court, however, followed the reasoning of the Second and Ninth Circuits in holding that this phrase only requires a showing of specific intent. All Assets Listed in Attachment A, 89 F. Supp. 3d at 826 (citing United States v. Technodyne LLC, 753 F.3d 368, 383-84 (2d Cir. 2014); United States v. $671,160.00 in U.S. Currency, 730 F.3d 1051, 1056 n.2 (9th Cir. 2013)).

"The starting point for any issue of statutory interpretation . . . is the language of the statute itself." United States v. Bly, 510 F.3d 453, 460 (4th Cir. 2007). We have previously held that "a natural reading" of the words "in order to obstruct justice" in the U.S. Sentencing Guidelines meant that the conduct it modifies must have been committed "with the specific intent" to obstruct justice. United States v. Blount, 364 F.3d 173, 178 (4th Cir. 2004), vacated on other grounds, Blount v. United States, 543 U.S. 1105 (2005). In other words, "so long as the defendant had the specific purpose

34

of obstructing justice" the intent requirement is met.  Id.; cf. Specific Intent, Black's Law Dictionary (10th ed. 2014) (defining the term to mean "[t]he intent to accomplish the precise criminal act that one is later charged with").

Congressional intent also favors a specific intent requirement.  The claimants' desired interpretation relies on words that are not in the statute:  had Congress wanted to make § 2466 apply only where avoiding prosecution was the "sole" or "principal" reason for a person's absence from the United States, adding those modifiers to the statute would accomplish the goal easily.

Further, Congress clearly anticipated § 2466 would apply to individuals with no reason to come to the United States other than to defend against criminal charges.  As the Second Circuit noted in Collazos, "Subpart B also applies to persons who, qualifying in all four other respects for disentitlement, decline to 'enter' the United States' jurisdiction."  368 F.3d at 199.  Because the subpart explicitly applies to both those refusing to "enter" and those refusing to "re-enter," § 2466(a)(1)(B), the court reasoned the former category could only be those who have never before entered the United States. Id. at 199-200 (finding the statute applies to persons who "may have never set foot within the territorial jurisdiction of the United States, know that warrants are outstanding for them and,

35

as a result, refuse to enter the country" (emphasis added)). Such individuals will often be foreign nationals with no ties to the United States other than their alleged criminal conduct and the indictment describing it.

Because the statute must apply to people with no reason to come to the United States other than to face charges, a "sole" or "principal" purpose test cannot stand. The principal reason such a person remains outside the United States will typically be that they live elsewhere. A criminal indictment gives such a person a reason to make the journey, and the statute is aimed at those who resist nevertheless.

Finally, we note that this decision is consistent with the precedent in our sister circuits who have addressed the question. The Second and Ninth Circuits have explicitly adopted a specific intent standard for § 2466. See Technodyne, 753 F.3d at 384 (quoting $671,160.00, 730 F.3d at 1056 n.2, in adopting a specific intent standard). And while claimants argue that the D.C. and Sixth Circuits have adopted a stricter standard, we interpret their decisions to be consistent with ours and those of the Second and Ninth Circuits.

In United States v. $6,976,934.65, Plus Interest Deposited into Royal Bank of Scotland International, Account No. 2029-56141070, Held in Name of Soulbury Ltd., 554 F.3d 123 (D.C. Cir. 2009), the court held that "the district court erred in

36

concluding that the statute does not require the government to show that avoiding prosecution is <u>the</u> reason Scott has failed to enter the United States." 554 F.3d at 132. The claimants argue that the court's emphasis placed on the word "the" shows it was adopting a "sole" purpose standard. There are two problems with this interpretation. First, placing emphasis on "the" could simply demonstrate that the court was equating the intent standard with but-for causation. In other words, it is at least as likely that the <u>Soulbury</u> court meant that the government must show the claimant would enter the country and face prosecution if he did not specifically wish to avoid prosecution. Second, in <u>Soulbury</u> the government's only mens rea evidence was a television interview demonstrating the claimant's awareness of a warrant for his arrest in the United States. <u>Id.</u> at 129-30. This evidence was insufficient to show <u>conclusively</u> that avoiding prosecution was even <u>a</u> reason that the claimant remained outside the United States, and neither the district court nor the government had actually attempted to show intent, believing the requirement was met by showing mere "notice or knowledge." <u>Id.</u> at 132. The most that can be taken from the <u>Soulbury</u> decision, then, is that the intent standard in § 2466 is more than knowledge. But the claimants are simply incorrect to assert that the opinion weighed in on the distinction between specific intent and sole intent at issue here—it did not.

37

The Sixth Circuit's opinion in United States v. Salti, 579 F.3d 656 (6th Cir. 2009), is similarly not in conflict with our own. That decision reversed disentitlement where the district court had found the claimant's poor health "irrelevant as a matter of law" on the question of intent. Id. at 665. The court said, "If Al Ammouri is indeed too sick to travel, such that his illness is what prevents him from returning to the United States, the Government has not shown as a matter of law that Al Ammouri's being in Jordan, and not the United States, is 'in order to avoid criminal prosecution.'" Id. at 665-66 (emphasis added). The court left open the possibility, however, that while poor health might be a reason for his absence, the government might still prove that avoiding prosecution motivated his absence, making him a fugitive subject to disentitlement, and so remanded the case for further proceedings. Id. at 666.

Because the plain language of the statute, the legislative intent, and the weight of persuasive authority all favor doing so, we adopt a specific intent standard for § 2466 and affirm the district court.

B.

The claimants' next contention is that the district court's findings of intent with respect to each of them were erroneous. We review these findings for clear error, for while determining whether claimants are fugitives is a legal determination that

38

would be reviewed de novo, Collazos, 368 F.3d at 195, the issue of claimants' intent is a factual predicate to the legal question, Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985) (holding that "[b]ecause a finding of intentional discrimination is a finding of fact," the standard of review is "clearly erroneous").

The claimants' principal argument is that the district court impermissibly relied on the fact that each of them is fighting extradition in finding specific intent. But the district court did not rely solely on this evidence—it merely considered it as a relevant part of a holistic analysis. And the weight of persuasive authority on this question clearly favors finding opposition to extradition relevant to the inquiry. E.g., Soulbury, 554 F.3d at 132 ("Likewise, under the third prong, Scott's renunciation of his U.S. citizenship is insufficient without some evidence that he took this action to avoid extradition." (emphasis added)); United States v. $1,231,349.68 in Funds, 227 F. Supp. 2d 130, 133 (D.D.C. 2002) (finding that the claimant was "continuing to avoid prosecution by opposing extradition" and that this conduct represented "precisely the type of situation that Congress intended to address when it enacted the Civil Asset Forfeiture Reform Act of 2000"); see also United States v. Real Prop. Commonly Known as 2526 155th Place SE, No. C07-359Z, 2009 WL 667473, at *1 (W.D.

39

Wash. Mar. 12, 2009); <u>United States v. All Funds on Deposit at Citigroup Smith Barney Account No. 600-00338</u>, 617 F. Supp. 2d 103 (E.D.N.Y. 2007). The claimants are unable to respond to the government's logical conclusion that a "three-year, multi-million-dollar quest to oppose coming to the United States is most surely relevant to their intent."

Moreover, the district court did not rely solely on the claimants' resistance to extradition. Instead, it reviewed each claimant and noted additional evidence of an intent to avoid prosecution. For example, Kim Dotcom posted a message to Twitter stating "HEY DOJ, we will go to the U.S. No need for extradition. We want bail, funds unfrozen for lawyers & living expenses." <u>All Assets Listed in Attachment A</u>, 89 F. Supp. 3d at 827. The court rightly found this and other public statements to strongly suggest Dotcom was resisting extradition to posture for criminal proceedings, using the ability to avoid prosecution as leverage. Finn Batato and Mathias Ortmann made statements in declarations that they were "actively contesting the legal basis on which the United States has issued the indictment." <u>Id.</u> The court found that this, combined with their opposition to extradition and statements that they would remain in New Zealand sufficient to show an intent to avoid prosecution. Other claimants were shown to have made statements that they were

40

avoiding international travel to reduce their risk of extradition and the prospect of prosecution. Id. at 829.

The claimants' argument that they have legitimate reasons to remain where they are, such as jobs, businesses, and families does not disprove that avoiding prosecution is the reason they refuse to come to the United States. As we have already rejected their argument for a "sole intent" standard, the existence of additional reasons to remain in one's home country are utterly unpersuasive because they do not contradict the evidence relied upon by the district court. In fact, their argument demonstrates another reason to reject that very high standard—almost any claimant could defeat disentitlement by merely asserting a self-serving reason to remain outside the United States. Under the claimants' preferred standard, the statute might easily be rendered a nullity.

Finally, we address the evidence of intent for two particular claimants who do not face extradition in their home countries. Claimant Sven Echternach argues that his "absence from Germany could lead to a default judgment, or potentially even a German arrest warrant in proceedings related to [the U.S. charges]," and that this is his reason for remaining there. Appellants' Br. 35 (internal quotations omitted). This assertion, however, is based on the testimony of Echternach's own attorney, and the district court spent considerable energy

41

demonstrating that the scenario he described was highly doubtful, particularly because his trouble with German authorities is based on the crimes he is charged with in the United States. Id. at 829-31. The court noted that the attorney whose advice Echternach is following "has all but admitted that his advice is predicated on his desire, as a criminal defense attorney, to keep his client from traveling to a country where he will be arrested." Id. at 831. Moreover, the court found that Echternach specifically fled to his home country, stating that he refuses to leave (despite wishing to travel internationally) because Germany does not extradite its nationals. Id. at 830.

Claimants also argue there is no evidence Julius Bencko returned to his home country of Slovakia, being driven across Europe from Portugal by a Portuguese national, to avoid prosecution. But Bencko told a third party that "he was 'stuck here in this post commie state . . . the sooner the USA will do some steps the soner [sic] they will let me go.'" Id. at 831 (quoting Bencko declaration). Bencko told this person that he would prefer not to travel outside the country but could if necessary and stated that he faced a fifty-five-year sentence in the United States. The district court did not abuse its discretion in finding these statements taken together showed intent to avoid prosecution.

42

V.

The claimants make two arguments regarding the effect of international law on the application of § 2466, which we now address. Both are questions of law which we review de novo. See United States v. Al-Hamdi, 356 F.3d 564, 569 (4th Cir. 2004).

First, they argue that disentitling New Zealand residents violates the Charming Betsy canon of interpretation which requires courts to interpret federal statutes "consistent with our obligations under international law," Kofa v. INS, 60 F.3d 1084, 1090 (4th Cir. 1995) (citing Murray v. The Charming Schooner Betsy, 6 U.S. 64, 118 (1804)), because it is inconsistent with the United Nations Convention Against Transnational Organized Crime ("UNTOC").

The relevant portion of UNTOC says,

Any person whom [extradition] proceedings are being carried out in connection with any of the offences to which this article applies shall be guaranteed fair treatment at all stages of the proceedings, including enjoyment of all the rights and guarantees provided by the domestic law of the State Party in the territory of which that person is present.

UNTOC, art. 16, ¶ 13, Dec. 12, 2000, 2255 U.N.T.S. 209. The claimants argue that disentitlement prevents them from exercising their rights under New Zealand law and thereby violates the multinational treaty to which both the United States and New Zealand are parties.

43

None of the claimants' rather conclusory arguments made to this Court respond to the district court's ruling on this issue. It held that there was nothing inconsistent about allowing the claimants to pursue their rights in New Zealand courts, meanwhile subjecting them to default judgment in civil proceedings in the United States which they refused to defend: "That the exercise of their rights in new Zealand may cause disadvantages for the claimants with respect to litigation occurring in America does not mean they are being treated <u>unfairly</u> or that they are <u>denied</u> their enjoyment of rights in New Zealand." <u>All Assets Listed in Attachment A</u>, 89 F. Supp. 3d at 833 (emphasis added).

The claimants only answer is to misconstrue a New Zealand court opinion as declaring disentitlement unconstitutional. The opinion to which they refer was only deciding a motion to strike a request that their government's enforcement of restraining orders on funds (issued in response to orders from the United States district court) be made <u>reviewable</u>. JA 2199-200. The case did not hold American disentitlement unconstitutional or in violation of UNTOC, and the claimants' selective quoting of a passage noting the "the plaintiffs would say" that the lack of reviewability would be unconstitutional is, obviously, not persuasive. <u>Compare</u> Appellants' Br. 37, <u>with</u> JA 2200.

The claimants also argue that claimant Echternach cannot be disentitled pursuant to § 2466 because the Mutual Legal Assistance Treaty between Germany and the United States ("U.S.-German MLAT") prohibits "any penalty" or "coercive measure" for failure to answer a summons. See The German Mutual Legal Assistance Treaty, Ger.-U.S., Oct. 18, 2009, T.I.A.S. No. 09-1018 [hereinafter MLAT]. The U.S.-German MLAT was signed in 2003 and ratified in 2007, years after § 2466 was enacted in 2000. As such, claimants argue that the Supremacy Clause dictates that the treaty trumps the statute. See Vorhees v. Fischer & Krecke, 697 F.2d 574, 575-76 (4th Cir. 1983).

The district court expressed "serious doubts that this treaty bars application of the fugitive disentitlement statute against all [foreign nationals] who maintain fugitive status in Germany." All Assets Listed in Attachment A, 89 F. Supp. 3d at 833. The district court's doubts were well founded. As its title suggests, the U.S.-German MLAT adopts a framework for making international evidentiary and witness requests between the two countries. It is not concerned with criminal extradition between the United States and Germany. The treaty covers, for example, "transferring persons in custody for testimony or other purposes," MLAT, Art. 1(2)5., so if the claimants were arguing that Echternach was being disentitled for refusal to testify it might be on stronger ground respecting the

45

relevance of the treaty. But because the U.S.-German MLAT does not restrict how the United States may act towards a criminal fugitive, there is no need to construe § 2466 consistent with its provisions, and the Charming Betsy canon is inapplicable. We therefore affirm the district court's decision.

## VI.

The claimants' final argument is that the district court erred in striking the marital claims to the defendant property asserted by Mona Dotcom, the estranged wife of claimant Kim Dotcom. The court recognized Mrs. Dotcom's possessory interest in two assets—a vehicle and the house in which she resides—but struck her claims to fifty percent of marital property affected by this litigation, concluding she lacked standing. The claimants argue this was error because Mrs. Dotcom only needs to show a "colorable interest" in the property (based on New Zealand property law) to establish Article III standing, and she has done so.[6] Both parties acknowledge that the New Zealand

---

[6] The Fourth Circuit uses a higher "dominion and control" test to determine Article III standing in criminal forfeiture cases. In re Bryson, 406 F.3d 284, 291 (4th Cir. 2005). We have used the same test an unpublished civil forfeiture case, United States v. 1077 Kittrell Street, 1991 WL 227792, at *1-2 (4th Cir. Nov. 7, 1991) (unpublished), and several of our district courts appear to have done the same, e.g., United States v. $104,250.00 in U.S. Currency, 947 F. Supp. 2d 560, 562 (D. Md. 2013). We need not resolve this issue because the (Continued)

Property (Relationships) Act (1976) ("PRA") is controlling on the question of Mrs. Dotcom's alleged interest.

To summarize, Mrs. Dotcom's argument is that she and her husband are estranged, that New Zealand law gives her the right to assert a claim to the marital property and creates a presumption that she is entitled to half, and that New Zealand law also recognizes this status as establishing an actual interest in that property. The argument is no different from that rejected by the district court.

Article III standing requires a plaintiff to show "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 561. As the district court found after a thorough analysis of New Zealand property law, Mrs. Dotcom has failed to articulate such an injury because she has not asserted a nonhypothetical legal interest in the property. Instead, she is arguing that the presumption of a fifty-percent share and the right to state a claim for division of the marital property establishes a "legally protected interest" in the property that is undermined by the disentitlement of her husband. It does not.

---

district court correctly found Mrs. Dotcom did not even meet the lower of the two standards.

47

Actual legal interests under the PRA vest "only in the event of a future Court order or compromise" between the married parties. Comm'r of Police v. Hayward (unreported) High Court, Auckland, CIV 2011-404-002371, 10 June 2013, Venning J, at para 103 (N.Z.) ("Hayward I"). While the New Zealand Criminal Proceeds Recovery Act (2009) ("CPRA"), which controls asset forfeiture, statutorily defines an "interest" as including "a right to claim," Hayward v. Comm'r of Police [2014] NZCA 625 at para [33] White J for the Court (N.Z.) ("Hayward II"), it is the Article III definition of interest which controls standing. That is, New Zealand law determines the extent of Mrs. Dotcom's interest in the property, and Article III determines whether that interest is sufficient to create standing. The district court rightly concluded that a right to state a claim "does not rise to the level of a legal or equitable interest sufficient to satisfy Article III." JA 1995 (citing United States v. Schifferli, 895 F.2d 987, 989 n.* (4th Cir. 1990))

The district court concluded, rightly, that because the Dotcoms had neither adjudicated their rights to the marital property nor reached a binding settlement, Mrs. Dotcom had no actual interest in the property and had therefore failed to even "allege that she owns the property." Id. The claimants' argument to the contrary is built upon two major errors. First, they argue that a New Zealand court declared that Mrs. Dotcom

48

had an existing interest in the property, but failed to mention that the opinion was explicitly nonprecedential and that it recognized an interest in a claim, not an interest in property. See JA 1994-96. Second, the claimants misrepresent the holding in Hayward II, implying that it reversed Hayward I and broadened the definition of a marital property interest to include hypothetical claims to such property. It did not—it very clearly distinguished the two statutes.

Finding the district court's reasoning persuasive, we affirm the decision to strike Mrs. Dotcom's claims for lack of standing.

## VII.

For the foregoing reasons, the district court opinion is affirmed in full.

AFFIRMED

FLOYD, Circuit Judge, dissenting:

The majority concludes that a district court may properly enter a forfeiture order against property entirely outside of the United States after barring foreign Claimants--who are also entirely outside of the United States--from defending the government's forfeiture claim.  I respectfully dissent because I conclude Article III's prohibition against advisory opinions precludes the exercise of <u>in rem</u> jurisdiction over a <u>res</u>, including real property, entirely outside of the United States and beyond the control of the district court.


I.

I agree with the majority that 28 U.S.C. § 1355 is a jurisdictional statute.  In enacting § 1355, Congress intended to fundamentally alter the law regarding <u>in rem</u> jurisdiction. <u>But see</u> <u>United States v. All Funds on Deposit in Any Accounts Maintained in Names of Meza or De Castro</u>, 63 F.3d 148, 152 (2d Cir. 1995) (reaching the opposite conclusion, i.e., that § 1355 is a venue statute, not a jurisdictional one).  Congress hoped to abolish the traditional requirement of <u>in rem</u> jurisdiction that a court have actual or constructive control over the <u>res</u>. <u>Compare</u> 28 U.S.C. § 2461(b) (providing that "[u]nless otherwise provided by Act of Congress . . . in cases of seizures on land the forfeiture may be enforced by a proceeding by libel which

50

shall conform as near as may be to proceedings in admiralty"[11]), with 28 U.S.C. § 1355(a), (b)(2) (providing district courts "original jurisdiction" over forfeiture actions concerning property "located in a foreign country"). A congressional grant of jurisdiction to the courts remains, however, subject to constitutional constraints on the federal judicial power. My objection to the ruling of the district court, and to the holding of the majority, is not grounded in an objection to its claim of jurisdiction over the res pursuant to Congress's grant of that jurisdiction, but is rather grounded in justiciability concerns arising from Article III.[2]

"The jurisdiction of federal courts is defined and limited by Article III of the Constitution." Flast v. Cohen, 392 U.S. 83, 94 (1968). Article III limits federal courts to deciding "cases" and "controversies." See U.S. Const. art. III, § 2.

---

[1] Admiralty law indisputably requires control of the res as a prerequisite to the exercise of jurisdiction.

[2] None of the circuits to apply § 1355(b)(2) and cited by the majority considered challenges to the exercise of in rem jurisdiction based on Article III. The D.C. Circuit acknowledged that application of § 1355(b)(2) must conform with the Constitution, but declined any justiciability analysis because no claimant raised constitutional objections. United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain, 295 F.3d 23, 27 (D.C. Cir. 2002) ("Unless the Constitution commands otherwise—and the claimant has raised no constitutional objections at all—the statute must be enforced.").

These two words "have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government." Flast, 392 U.S. at 94. Courts developed concepts of justiciability to express the limitations placed upon federal courts by Article III's case or controversy requirement. See id. at 95.

As one commentator cited by the majority notes, cases brought pursuant to § 1355(b)(2) implicate two distinct but related constitutional justiciability requirements--bindingness and redressability. See Courtney J. Linn, International Asset Forfeiture and the Constitution: The Limits of Forfeiture Jurisdiction Over Foreign Assets Under 28 U.S.C. § 1355(b)(2), 31 Am. J. Crim. L. 251, 297-99 (2004). In my view, bindingness presents the most serious problem here.[3]

---

[3] This is not to say that I am convinced by the majority's treatment of the redressability issue, ante, at 15-16. Lujan v. Defenders of Wildlife requires that it be "likely" and not "merely speculative" that an injury will be redressed by a favorable decision of the court. 504 U.S. 555, 561 (1992) (quotation marks omitted). Both the district court and the majority concluded that the actions by the New Zealand and Hong Kong courts to restrain the defendant res render it probable that those courts will enforce a judgment of forfeiture. Perhaps. I note, however, New Zealand's repeated disbursement of large amounts of the restrained assets even after the issuance of the forfeiture judgment, the revocation (and subsequent reimposition) of the restraining order by a Hong Kong court, J.A. 738-39, and an order by a New Zealand court enjoining the registration of the U.S. forfeiture judgment, J.A. 2220.

(Continued)

52

II.

The opinions of federal courts must be final and binding on the parties. "'[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.'" Flast, 392 U.S. at 96 (quotation omitted). Article III courts cannot render decisions subject to revision by another branch of government. See, e.g., Chi. & S. Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 113 (1948) ("Judgments, within the powers vested in courts by the Judiciary Article of the Constitution, may not lawfully be revised, overturned or refused faith and credit by another Department of Government."); Hayburn's Case, 2 Dall. 409, 410 n* (1792) (opinion of Wilson and Blair, JJ., and Peters, D.J.) ("[R]evision and control" of Article III judgments is "radically inconsistent with the independence of that judicial power which is vested in the courts").

The advisory opinion prohibition is founded on the principle that federal courts may only issue judgments that are

---

Further--although this question may safely be left for another day--it seems to me that if a foreign sovereign were to refuse to cooperate, the probability that a § 1355 forfeiture judgment would redress the government's injury might slip from "likely" to "speculative." Such a refusal to cooperate by a foreign sovereign may deprive the government of standing to pursue the forfeiture action.

binding and conclusive on the parties.  See Waterman, 333 U.S. at 113-14; Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 261-62 (1933) (explaining that a case was justiciable when it sought a "definitive adjudication" of a disputed right that would not be "subject to revision by some other and more authoritative agency"); Gordon v. United States, 69 U.S. 561, 561 (1864) (noting that the Constitution forbids federal courts from expressing opinions on a case "where its judgment would not be final and conclusive upon the rights of the parties").[4]  The revision of a court's judgment by "some other and more authoritative agency" renders the judgment an advisory opinion prohibited by Article III.  See Wallace, 288 U.S. at 262.

The majority side-steps this concern by cabining it to the separation of powers context.  One of the basic tenets of what constitutes a "case or controversy" cannot be elided so.  The defendant in this action--the res--is outside of the United States and beyond the control of the district court.  Absent control, no order of the district court can be binding on the

---

[4] The Supreme Court has similar concerns with regard to in rem jurisdiction, observing that when a defendant ship leaves a port and the plaintiff no longer has a res from which to collect, courts may find the judgment to be "useless" and not adjudicate the case based on a "traditional, theoretical concern[] of jurisdiction: enforceability of judgments." Republic Nat'l Bank of Miami v. United States, 506 U.S. 80, 87 (1992).

res because the fate of the res is ultimately not in the hands of the district court. Instead, the res in this case is subject to the control of the courts of New Zealand and Hong Kong. The district court's forfeiture order therefore merely advises the courts of a foreign sovereign that (in the district court's view under the laws of the United States) the United States should have title to the res. Those courts, of course, with control of the res and with the authority vested in them by their own sovereigns, remain free to revise, overturn, or refuse recognition to the judgment of the district court. The decision of the district court regarding title in the res is thus subject to a "more authoritative agency" outside of the Article III hierarchy. Without control of the res, the district court's decision cannot bind the res and thus constitutes an advisory opinion prohibited by Article III.

The risk of revision to the district court's judgment is no mere hypothetical. As the government notes, "[d]espite the registration of the restraints, the New Zealand courts released" over $5 million for legal fees and living expenses. Gov't's Br. 7. Additionally, even after receiving the "final" forfeiture order from the district court, New Zealand courts granted Dotcom monthly releases of $135,000 for living expenses. Id. at n.5. In fact, the district court recognized that the foreign courts "may or may not" register its order and that "New Zealand courts

55

may continue to litigate the issue of whether the assets will be forfeited." J.A. 1982. The government also concedes that "even with a valid forfeiture order, the fugitive's property may suffer no adverse effect." Gov't's Br. 20 n.13. In an in rem action, the district court cannot issue a judgment binding the res absent control of the res. Where, as here, a foreign sovereign controls the res because the res is located abroad, any in rem forfeiture order by a district court constitutes advice to the foreign sovereign regarding how it should vest title to the res.

III.

Our own precedent recognizes the Article III limits of in rem jurisdiction. We explored the interplay at length in our Titanic decisions. R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943 (4th Cir. 1999) (Titanic I); R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel, 435 F.3d 521 (4th Cir. 2006) (Titanic II). The Titanic cases involved disputes concerning the law of salvage as it applied to the wreck of the British passenger liner R.M.S. Titanic, which sank in the North Atlantic Ocean in 1912. As the majority notes, ante, at 12-14, the cases arose in admiralty and applied maritime law, and I readily accept that § 1355 attempts to divorce the in rem actions it authorizes from the traditional in rem principles of admiralty law. However, I

56

part ways with the majority because I read the <u>Titanic</u> cases to contain principles both of admiralty law and of constitutional law.

What makes <u>in rem</u> actions problematic from an Article III standpoint is that "judgments in them operate against anyone in the world claiming against <u>that</u> property." <u>Titanic I</u>, 171 F.3d at 957. Without control of the property, the judgment cannot "operate against anyone in the world" claiming interest in the defendant property. <u>Id.</u> "Only if the court has exclusive custody and control over the property does it have jurisdiction over the property so as to be able to adjudicate rights in it that are <u>binding against the world</u>." <u>Id.</u> at 964 (emphasis added). When, as here, the <u>res</u> is not in the court's possession, "the court may not adjudicate rights to the <u>res</u> and effectively bind others who may have possession. Consequently, a court could not exercise <u>in rem</u> jurisdiction, as traditionally understood, so as to vest rights in property outside of its territory . . . ." <u>Id.</u> (citation omitted). "<u>In rem</u> jurisdiction, which depends on sovereignty over property, cannot be given effect to property beyond a nation's boundaries of sovereignty." <u>Id.</u> at 966. Simply put, the <u>res</u> in this case is beyond the United States' sovereign territory and our courts cannot--absent control of the <u>res</u>--declare rights in it that are binding against the world.

Our decision in Titanic I emphasizes the importance of sovereignty--and control--for in rem actions. In Titanic I, we found the exercise of in rem jurisdiction proper because the court had constructive control over the wreck because it had a portion of the wreck in its control. The main body of the wreck itself was located in international waters, i.e., beyond the sovereign limits of any nation. Thus, although "the exclusiveness of any [in rem] order could legitimately be questioned by any other court in admiralty," we concluded that the court could, nonetheless, exercise an "'imperfect' or 'inchoate' in rem jurisdiction which falls short of giving the court sovereignty over the wreck." Id. at 967.

As Titanic II makes clear, the court's exercise of power in Titanic I was possible only because the wreck was outside the territorial limits of another sovereign. In Titanic II we announced the limits of constructive in rem jurisdiction grounded in the boundaries imposed upon courts by territorial sovereignty. We held that a court cannot exercise in rem or constructive in rem jurisdiction over property within the sovereign limits of other nations. Titanic II, 435 F.3d at 530. We held that a party "cannot come to a court in the United States and simply assert that the court should declare rights against the world as to property located in a foreign country."

58

_Id._   That is precisely what the government attempts to do in this case.

The majority is correct that the _Titanic_ cases applied the traditional, admiralty-based law of _in rem_ jurisdiction and is also correct that § 1355 attempted to alter that traditional law.  What the majority fails to recognize, however, is that the traditional limits of _in rem_ jurisdiction are also commanded by the Constitution's requirement that judgments by Article III courts be binding on the parties.  Needless to say, this requirement cannot be waived by statute.  Because the _res_ is a party and because the judgment purports to adjudicate rights in the _res_ binding against the whole world, control of the _res_ is the _sine qua non_ of _in rem_ actions.  Absent control, the court's judgment cannot bind the property but, instead, merely advises the foreign sovereign that _does_ control the property as to how a United States court believes the rights in the property should be settled.

The possible cooperation of the foreign sovereign is irrelevant, contrary to the weight the district court and the majority place on that variable.  Unlike the question of redressability, which is indeed a matter of probabilities, the requirement that a judgment be binding and conclusive on the parties is absolute.  Consider the circumstances of _Waterman_, which articulated bindingness as an essential requirement of

59

Article III's judicial power. In Waterman, the court of appeals determined that it had jurisdiction to review an order of the Civil Aeronautics Board awarding an overseas air route. 333 U.S. at 104-05. By statute, such orders were subject to presidential approval and the order in question had been approved by the President. Id. at 110-11. The court of appeals determined that even after it reviewed the Board's order, its review would remain subject to the approval or disapproval of the President. Id. at 113. The Supreme Court held the judgment of the court of appeals to be advisory: "Judgments, within the powers vested in courts by the Judiciary Article of the Constitution, may not lawfully be revised, overturned or refused faith and credit by another Department of Government." Id. I see no valid reason why a court should be prohibited from giving advisory opinions to domestic branches of government and yet be permitted to issue advisory opinions to foreign sovereigns.

The Supreme Court has never given any indication that the bindingness concerns in Waterman could be cured by a court's determination that the other entity was "likely" to follow its decision. While a judgment may in fact have a higher chance of eventually being binding on the parties where the foreign sovereign has acted cooperatively, the U.S. judgment remains "subject to later review or alteration by [foreign]

administrative action" and its bindingness remains--impermissibly--a question of probabilities.[5]  See id. at 114.

IV.

The district court in this case did not have control of the res.  The res is controlled by foreign sovereigns--New Zealand and Hong Kong.  Therefore, the district court could not in my view issue an order as to the res which would be binding against the world.  Foundational Article III principles preclude the court from entering a forfeiture order against the res in this case.  I would reverse the district court on this basis and deem the other issues presented by this appeal moot.

---

[5] It may be possible for the government to make a showing before the district court that the foreign sovereign would be compelled, by its own law, to give binding effect to a civil forfeiture judgment by a U.S. court.  However, the government has made no such showing in this case sufficient to assuage Article III concerns.